**INDIANA STATE BOARD OF HEALTH FACILITY ADMINISTRATORS, Appellant–Respondent,**

v.

**Angela WERNER, H.F.A., Appellee–Petitioner.**

No. 49A02–0505–CV–375.

Court of Appeals of Indiana.

Feb. 10, 2006.

Steve Carter, Attorney General of Indiana, Elizabeth C. Rogers, Deputy Attorney General, Indianapolis, for Appellant.

J. Richard Kiefer, Darlene R. Seymour, Kiefer & McGoff, Indianapolis, for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

The Indiana State Board of Health Facility Administrators ("the Board") appeals the trial court's reversal of the Board's order suspending Angela Werner's health facility administrator license and requiring her to pay the costs of the proceedings. We affirm in part and reverse in part and remand.

### Issues

The Board raises three issues, which we restate as:

I. whether the trial court had subject matter jurisdiction to review the Board's order;

II. whether the trial court properly concluded that Werner was entitled to relief; and

III. whether the trial court properly compelled the Board to adopt the sanctions recommended by the Administrative Law Judge ("ALJ").

### Facts

From 1996 to 2000, Werner was a health facility administrator at Westpark Rehabilitation Center in Evansville. On September 24, 1999, a complaint was filed with the Indiana State Department of Health ("ISDH") regarding a September 21, 1999 incident between two residents at Westpark. Although two investigations found the complaint unsubstantiated, a third investigation led to the filing of a complaint against Werner by the Attorney General's Division of Consumer Protection ("the State").

The Board appointed an ALJ, who conducted hearings on January 27–31, 2003, and on June 9–12, 2003. On December 2, 2003, the ALJ issued her recommended findings of fact and conclusions of law, which provided in part:

## FINDINGS OF FACT

13. At the hearing the State attempted to enter evidence regarding aspects of the Respondent's performance as an [health facility administrator] that are not included in the complaint.

14. The State is bound by what it alleged in the complaint; therefore only the allegations made in the complaint can be considered in deciding whether any action should be taken against Respondent's license in this matter.

15. While the State's complaint against Respondent references 9 residents the State presented substantial evidence on only two residents—JM and Helen Straukamp.

16. On September 21, 1999, Helen Straukamp, a female resident at Westpark who had dementia was standing in the hallway.

17. JM, a male resident at Westpark, came up behind Straukamp and was cursing.

18. JM faced Straukamp and pushed her into a wall.

19. Straukamp fell back and hit her head on the wall. She then fell to the floor.

20. The injuries Straukamp suffered during this incident with JM led to her death a few weeks later.

21. This September 21, 1999 incident prompted the three complaints filed with the ISDH and the three resulting complaint surveys.

22. JM was a resident of Westpark from October 15, 1993 until December 13, 1999.

23. Prior to his admission at Westpark, JM had a history of physical violence including a murder conviction.

24. The history was not a part of JM's chart on file at the nurses' station and was unknown to Respondent until after the September 21, 1999 incident.

25. JM was admitted to Westpark with a diagnosis of organic brain syndrome.

26. Throughout his stay at Westpark, JM had numerous incidents of verbal aggression against staff and other residents. These incidents ranged from cursing and yelling to threats of physical violence. These verbal outbursts did not occur consistently. JM sometimes went for months without verbal incident. These threats were frightening to some staff, but not to others.

27. Between the time Respondent came to Westpark and September 21, 1999, JM was involved in three incidents of physical aggression.

1. On November 15, 1996, JM hit another resident and orally threatened a social services employee.

2. On November 29, 1996, JM threatened and knocked down another resident. This fall resulted in a hip fracture for the other resident.

3. On October 28, 1997, another resident slapped JM. JM attempted to choke that resident. The other resident pushed JM back and JM fell and broke his hip.

28. After the November 29, 1996 incident JM's medications were adjusted by psychiatrist Dr. Norum. JM did not experience another incident of physical aggression until October 28, 1997. JM did not initiate the October 28, 1997 incident.

29. There are some inconsistencies in the recommendations from psychiatric professionals regarding whether JM should be transferred to a different kind of facility; however, there does seem to be agreement that JM needed a more structured environment.

30. In January, 1997, JM was seen by a psychiatric consultant who stated in his report that JM was "stubborn, irritable and easily angered ... episodically combative and unpredictable" and recommended that JM be transferred to a more appropriate facility which is "more structured and can provide him with a behavior modification program to restructure his behavior".

31. In July, 1997, Dr. Norum, psychiatrist, stated, "JM is an accident looking for a place to happen." He suggested emergency detention in a locked unit.

32. In August, 1997, Dr. Norum stated that JM's mood was very stable with the medication depakote.

33. Dr. Norum saw JM in early October, 1997 and stated that he was stable and that his current medications should be continued.

34. After the October 28, 1997, incident Dr. Vance did extensive psychological testing on JM and determined that he did not need to be placed in a behavioral unit at that time. He did recommend that JM be controlled through behavior programming and by maintaining a highly structured day.

35. Behavioral units at long term care facilities are designed to provide a highly structured and secure environment for residents whose diagnoses and behavior warrant it.

36. Westpark does not have a behavioral unit.

37. From October 28, 1997 until September 21, 1999 JM had no more incidents of physical aggression. He did have numerous incidents of verbal aggression and threats.

38. After the September 21, 1999 incident JM was put on one-to-one monitoring until he was sent that same day to the psychiatric unit at Gibson County General Hospital (Gibson Central) for observation.

39. JM stayed at Gibson General until September 30, 1999 when he was sent back to Westpark.

40. JM's room was moved closer to the nurse's station and the smoking room when he returned from Gibson General. JM liked to smoke in the smoking room. Removing him from a potentially volatile situation by convincing him to go to the smoking room was sometimes a successful de-escalation tool for JM.

41. The facility has several approaches to prevent JM from engaging in physical or verbal aggression or to redirect JM during these incidents. Most of the interventions involved calming JM down, extricating him from a given situation and redirecting him to other activities which would be calming to him.

42. These interventions remained for the most part unchanged during Respondent's tenure at Westpark. These interventions were sometimes successful in calming JM down and preventing further aggression, but they did not always work.

43. Verbal aggression, threats, and unwanted touching are not uncommon in dementia patients. They cannot always be predicted or prevented.

44. Based on the recommendations of the psychiatric consultant and Drs. Norum and Vance and the fact that the behavioral interventions were not entirely successful, Westpark's social services department should have set up a more

structured behavior management program for JM.

45. Respondent was aware of the four incidents of physical aggression involving JM which occurred during her time at Westpark at the time they happened.

46. While she may not have been aware of all the incidents of verbal aggression, Respondent knew that JM had numerous incidents of verbal aggression and threats while she was Westpark's administrator.

47. Twice during her employment at Westpark, Janice Maxey, one of the Social Services Directors employed at Westpark during Respondent's tenure, attempted to involuntarily transfer JM because of his aggressive behavior.

48. After a verbal outburst by JM of July 30, 1997, Judy Dockery, the local ombudsman was contacted. Ms. Dockery told Ms. Maxey and Respondent that she would block an involuntarily transfer of JM. She made some superficial suggestions for decreasing JM's aggression.

49. Respondent believed at the time that as ombudsman Ms. Dockery had the authority to prevent an involuntarily transfer of a long term care resident. Based on this understanding about Ms. Dockery's authority, Respondent cancelled JM's involuntary transfer.

50. Ombudsmen do not have any authority to prevent involuntary transfers of long term care facility residents.

51. As Westpark's administrator Respondent should have known that ombudsmen do not have the authority to prevent involuntary transfers.

52. Soon after the September 21, 1999 incident, Robbie Jo Franklin, Westpark's Director of Nursing and Karen Langston, Social Service's Director at the time, made several attempts to find alternative placement for JM. They tried behavioral units in Vanderburgh County where Westpark is located. Because JM was a veteran they tried several VA centers in Indiana and in several surrounding states. They were unable to find a facility that would take JM.

53. On September 30, 1999, Karen Langston sent a referral on JM to Southwest Indiana Mental Health Center to determine whether he would be eligible for a mental health facility. It was determined that, because of his diagnosis of organic brain syndrome, he would not benefit from mental health therapy; therefore was not eligible for treatment at a mental health facility.

54. From September 30, 1999 until December 13, 1999 JM engaged in several incidents of verbal aggression and threats. He did not engage in any acts of physical aggression during this time.

55. There was heightened awareness on the part of Westpark's staff after September 30, 1999 of JM's potential for violence.

56. Westpark did inservicing on behavior management in response to the September 21, 1999 incident.

57. On December 13, 1999, JM threatened a female resident who used a merry walker with serious bodily harm and threatened a staff member in the dining room.

58. As a result of this December 13, 1999 incident, Westpark had JM transferred to the Mulberry Center under an involuntary commitment.

59. There were problems with the behavior tracking program at Westpark during Respondent's tenure. These problems were, at a minimum, problems with documentation. Behavior tracking is primarily the responsibility of the social services department and is a proper subject for findings on an ISDH survey.

60. Robbie Jo Franklin (Director of Nursing from January, 1999 until after Respondent left Westpark), Homer Skaggs, M.D. (JM's personal physician), and Douglas Hatler, M.D. (Westpark's medical director) all testified that the overall quality of care at Westpark was very good when Respondent was the administrator.

The Administrative Law Judge Credits his testimony.

Ms. Franklin testified that Respondent set high standards for Westpark's department heads and held them to those standards.

The Administrative Law Judge credits this testimony.

The Administrative Law Judge finds that Respondent's management style did not negatively impact resident care at Westpark.

Despite the problems with JM the evidence supports the facts that overall resident care was very good under Respondent's leadership.

## CONCLUSIONS OF LAW

\* \* \* \* \* \*

3. The State failed to prove that Respondent undertook professional activities she was not qualified to undertake. See IC 25–1–9–4(4)(A)(1).

4. Respondent's not knowing that the ombudsman did not have the power to prevent JM's involuntary transfer from Westpark constitutes a "failure to keep abreast of current professional . . . practice", IC 25–1–9–4.

\* \* \* \* \* \*

6. Taking into consideration all the recommendations of mental health professionals listed in Findings of Fact 30, 31, 31, Janice Maxey's attempts to transfer JM, and Respondent's ignorance about the power of the ombudsman to prevent

an involuntary transfer, the Administrative Law Judge finds that Respondent violated 849 IAC 2–1–1(1) in that Respondent failed to "exercise . . . sound decision making and judgment" in failing to effect JM's transfer prior to December 1999.

\* \* \* \* \* \*

8. 42 CFR 483.13(c) deals with staff treatment of residents. No evidence was presented that Westpark residents suffered abuse by Westpark staff during Respondent's tenure as Administrator; therefore, the State failed to prove that Respondent violated 42 CFR 483.13(c).

9. Given her knowledge of JM's incidents of physical and verbal aggression, Respondent's failure to ensure that Westpark's social services department set up a more effective behavior management approach for JM constitutes a violation of 42 CFR 483.25(f)(2) and 840 IAC 2–1–3(1)(4)(B) and (C).

10. The ALJ makes no findings about whether any of the ISDH survey findings were substantiated.

11. In deciding what sanctions should be imposed against H.F.A. who has failed to comply with the standards of professional practice established by the Board it is necessary to look at the overall function of a facility and to look specifically at the overall quality of resident care.

12. The fact that resident care was overall very good under Respondent's leadership as administrator of Westpark should mitigate any sanction the Board imposes upon her.

Tr. pp 18–27. The ALJ ultimately recommended that Werner be censured and that she not be required to pay the costs of the proceedings.

The State objected to the ALJ's findings, conclusions, and recommended sanction. On February 5, 2004, after the parties submitted briefs, the Board heard oral arguments. Immediately after the oral argument, the Board voted to reject the ALJ's recommended findings, conclusions, and sanction; to suspend Werner's license indefinitely with an opportunity to have it reinstated in five years; and to assess costs against Werner in the amount of $16,051.51.[1]

Werner then filed a motion to vacate the Board's decision based on its failure to adopt findings and conclusions and on its failure to consider the evidence. In response, the Board vacated its earlier order and voted to adopt the ALJ's findings and conclusions. However, the Board ratified its previous sanction of an indefinite suspension and the imposition of costs. The Board did not make any additional findings or conclusions supporting the imposition of the more severe sanction.

Werner sought judicial review of the Board's decision. After oral argument, the trial court reversed the Board's decision and found in part:

17. When the Board adopted the ALJ's Findings of Fact and Conclusions of Law on April 1, 2004, there is no indication from the Board minutes that it considered any evidence.

18. The Board's decision was arbitrary, capricious and an abuse of discretion. There is no evidence that the Board reviewed the testimony presented at the hearing or even considered the findings of the ALJ. The Board arbitrarily decided to reject the ALJ's recommendation and imposed a sanction based on no findings of their own.

19. The Board's action is without observance of the procedure required by Indiana law. The Order was not supported by the adopted Findings of Fact and Conclusions of Law, as required by the Administrative Orders and Procedures Act ("AOPA").

20. The Board's decision is unsupported by substantial evidence and violates Angela Werner's constitutional right to due process. Although the Board adopted the findings and conclusions of the ALJ, it imposed a sanction inconsistent with those findings and conclusions without holding another hearing at which it could evaluate all of the evidence and observe the witnesses firsthand.

21. The Board's action was directed at Angela Werner; she was a party to the proceeding; and was adversely affected by the action. Therefore, Angela Werner has standing to bring this Petition for Review.

22. Angela Werner has exhausted her administrative remedies by filing a Motion to Vacate the agency action with the Board.

23. The Petition for Review was filed within thirty (30) days of notice of the agency action.

24. Pursuant to IC 4–21.5–5–15, this court may compel agency action that has

---

1. Indiana Code Section 25–1–9–15 provides in part:

Practitioners who have been subjected to disciplinary sanctions may be required by a board to pay for the costs of the proceeding. The practitioner's ability to pay shall be considered when costs are assessed. If the practitioner fails to pay the costs, a suspen-sion may not be imposed solely upon the practitioner's inability to pay the amount assessed....

Indiana Code Section 25–1–9–9 separately describes the available disciplinary sanctions. The parties treat the assessment of costs as if it were a sanction. For argument's sake, we do also.

been unreasonably delayed or unlawfully withheld.

25. Because the indefinite suspension imposed by the Board was arbitrary and unsupported by the evidence, the April 1, 2004 Order is hereby vacated and the Board is compelled to affirm the ALJ's Order recommending censure of Angela Werner.

App. pp. 6–10. The Board now appeals.

## Analysis

### I. Jurisdiction

■ The Board first argues that we should set aside the decision of the trial court and dismiss the appeal for lack of subject matter jurisdiction. The Board contends that the trial court lacked subject matter jurisdiction because neither the agency record nor a motion for extension of time to file the record was timely filed with the trial court. Under the Indiana Administrative Orders and Procedures Act ("AOPA"), "[f]ailure to file the record within the time permitted by this subsection, including any extension period ordered by the court, is cause for dismissal of the petition for review by the court, on its own motion, or on petition of any party of record to the proceeding." Ind.Code § 4–21.5–5–13(b).

Werner concedes that her motion for extension of time to file the agency record was filed two days late. She argues, however, her delay resulted in lack of jurisdiction over the case, not lack of subject matter jurisdiction. Werner points out that questions of jurisdiction over the case must be raised at the earliest opportunity and argues that the Board's failure to raise the issue before the trial court waives it on appeal. *See Harris v. Harris*, 800 N.E.2d 930, 936 (Ind.Ct.App.2003) ("A judgment rendered by a court without jurisdiction to hear the particular case is voidable because the jurisdictional defect is waivable

if not attacked by a timely appeal."), *trans. denied* (2004). Thus, we must determine whether Werner's failure to file a timely extension of time to file a record affects the trial court's subject matter jurisdiction or its jurisdiction over the case.

The Board's argument that the trial court did not have subject matter jurisdiction is based on a line of cases holding that the time provisions of Indiana Code Section 4–21.5–5–13 are mandatory and conditions precedent to a court acquiring jurisdiction to consider a petition for judicial review. *See Clendening v. Indiana Family and Soc. Servs. Admin.*, 715 N.E.2d 903, 904 (Ind.Ct.App.1999); *Park v. Med. Licensing Bd. of Indiana*, 656 N.E.2d 1176, 1179 (Ind.Ct.App.1996), *trans. denied* (1996); *Indianapolis Yellow Cab, Inc. v. Indiana Civil Rights Comm'n*, 570 N.E.2d 940, 942 (Ind.Ct.App.1991), *trans. denied*; *see also Seattle Painting Co. v. Comm'n of Labor*, 661 N.E.2d 596, 598 (Ind.Ct.App. 1996) (concluding that trial court did not have "subject matter jurisdiction" without analysis of the different types of jurisdiction), *trans. denied*. These cases further observed that once the time for filing has expired, the trial court is without jurisdiction to hear the appeal. *Park*, 656 N.E.2d at 1179. These cases, however, do not specifically analyze whether trial courts lack subject matter jurisdiction or jurisdiction over the case, as is the issue before us today.

We have noted that the confusion regarding the distinction between subject matter jurisdiction and jurisdiction over the case is understandable, given that we have often discussed whether a particular court had "jurisdiction" without specifying which of the particular types of jurisdiction they were addressing. *Dixon v. Siwy*, 661 N.E.2d 600, 605 n. 10 (Ind.Ct.App.1996). In *Buckalew v. Buckalew*, 754 N.E.2d 896, 898 (Ind.2001), the difference between the

different types of jurisdiction was explained:

> We observe that the term "jurisdictional" is not helpful in resolving the present issue. To render a valid judgment, a court must possess two forms of jurisdiction: jurisdiction over the subject matter and jurisdiction over the parties.... Once a court has acquired subject matter and personal jurisdiction, challenges to its subsequent rulings and judgment are questions incident to the *exercise* of jurisdiction rather than to the *existence* of jurisdiction. We have noted that courts sometimes refer to "jurisdiction over the particular case"
>
> ....

*Id.* (emphasis added) (quotations and citations omitted).

 Said another way, "[s]ubject matter jurisdiction is the power of a court to hear a class of cases, while jurisdiction over the case is the power of the court to hear a particular case within the class of cases." *In re Paternity of M.G.S.*, 756 N.E.2d 990, 997 (Ind.Ct.App.2001), *trans. denied.* "Subject matter jurisdiction concerns the power of a court to decide particular kinds of cases and depends neither on the intricacies of the pleadings nor on the correctness of any decision made by a court." *Strong v. Jackson*, 781 N.E.2d 770, 772 (Ind.Ct.App.2003), *trans. denied.*

 "Resolution of the subject matter jurisdiction issue involves · determining whether the claim advanced falls within the general scope of authority conferred upon the court by constitution or statute." *Blanck v. Ind. Dep't of Corr.*, 829 N.E.2d 505, 508 (Ind.2005) (concluding that none of the referenced statutes confer subject matter jurisdiction over claims challenging judicial review of prison disciplinary decisions); *see Long v. Wayne Twp. Assessor*, 820 N.E.2d 190, 192 (Ind.Tax 2005) (finding subject matter jurisdiction where

Indiana Code Section 33–26–3–1 provides that the Tax Court has exclusive jurisdiction over any case arising under the tax laws and that is an initial appeal of a final determination by the board). In determining whether the trial court had subject matter jurisdiction over petitions for judicial review, we look to Indiana Code Section 4–21.5–5–2(a), which provides, "Judicial review is initiated by filing a petition for review in the appropriate court." AOPA defines "court" as "a circuit or superior court responsible for taking any action under this article." I.C. § 4–21.5–1–5. Werner filed her petition for judicial review in the Marion Superior Court, a court authorized by statute to review agency actions. Thus, the trial court had the power to hear this class of cases.

At the heart of the Board's argument is the notion that trial courts may only consider petitions for judicial review in which all of the statutory prerequisites have been met. It is only then, the Board argues, that a trial court has the power to hear that class of cases. The Board relies on Indiana Code Section 4–21.5–5–2, which provides that a person is·entitled to review of a final agency action if certain conditions are met. One of those conditions is compliance with Indiana Code Section 4–21.5–5–13 requiring the timely filing of the agency record. *See* I.C. § 4–21.5–5–2(b)(4).

Contrary to the Board's argument, however, a person's satisfaction of the conditions entitling him or her to judicial review goes to the trial court's jurisdiction over the case, not the trial court's subject matter jurisdiction. To hold otherwise would essentially make subject matter jurisdiction and jurisdiction over the case one and the same for purposes of judicial review. Following the Board's assertion to its logical conclusion, a trial court would only have·subject matter jurisdiction if all of

these conditions to a person seeking judicial review are met, in which case the trial court would also have jurisdiction over the case. This would make the distinction between subject matter jurisdiction and jurisdiction over the case a distinction without a difference.

Such an outcome is inconsistent with *Williams v. Williams,* 555 N.E.2d 142 (Ind.1990). In the context of interstate custody matters, the *Williams* Court held, "The jurisdictional limitations imposed by the UCCJA are not equivalent to declarations of subject matter jurisdiction, but rather are refinements of the ancillary capacity of a trial court to exercise authority over a particular case." *Id.* at 145. Likewise, in *Shipshewana Convenience Corp. v. Board of Zoning Appeals of LaGrange County,* 656 N.E.2d 812, 813 (Ind.1995), the Court observed, "Where there is a failure to comply strictly with the jurisdictional requirements embodied in the statute providing for judicial review of the decisions of a board of zoning appeals, a trial court does not acquire jurisdiction of the parties or the particular cause." Although *Shipshewana* specifically involved the judicial review of board of zoning appeals decision, the Court noted, "This is an important principle of administrative law generally and has been applied in appeals from administrative determinations on a wide variety of subjects . . . ." *Id.* at 813 n. 9. Based on these cases, we conclude that the satisfaction of technical requirements affects the trial court's acquisition of jurisdiction over the case, not its acquisition of subject matter jurisdiction. Thus, the trial court had subject matter jurisdiction over Werner's petition for judicial review.

■ Whether the trial court had jurisdiction over the case (or whether it was able to exercise its subject matter jurisdiction) is another question. Werner's failure to timely file the record or request and extension of time at most affects the trial court's jurisdiction over the case. However, because the Board raises this issue for the first time on appeal and did not timely raise it with the trial court, it is waived. *See Harris,* 800 N.E.2d at 936.

## II. The Board's Decision

■■ The Board argues the trial court improperly concluded that its decision was arbitrary and unsupported by the evidence. When reviewing the decision of an administrative agency, we are bound by the same standard of review as the trial court. *Indiana–Kentucky Elec. Corp. v. Comm'r, Indiana Dep't of Envtl. Mgmt.,* 820 N.E.2d 771, 776 (Ind.Ct.App.2005). We may grant relief only if we determine that the person seeking judicial relief has been prejudiced by an agency action that is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

I.C. § 4–21.5–5–14(d). The burden of demonstrating the invalidity of agency action is on the party seeking judicial review. I.C. § 4–21.5–5–14(a).

■ A decision is arbitrary and capricious if it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency. *Indiana–Kentucky Elec.,* 820 N.E.2d at 776. A decision may also be arbitrary and capricious where only speculation furnishes the basis for a decision.

*Indiana State Bd. of Registration and Ed. for Health Facility Adm'rs v. Cummings,* 180 Ind.App. 164, 171, 387 N.E.2d 491, 495–96 (1979). Simply said, an agency decision is arbitrary and capricious where there is no reasonable basis for the decision. *Chesser v. City of Hammond,* 725 N.E.2d 926, 930 (Ind.Ct.App.2000).

Here, the ALJ conducted a lengthy hearing in which voluminous amounts of evidence were produced. After the hearing the ALJ entered extensive findings of fact and conclusions of law. Pursuant to those findings and conclusions, the ALJ recommended that Werner be censured and that she not be ordered to pay the costs of the proceedings. Shortly thereafter, the Board heard oral arguments concerning the ALJ's findings and conclusions. That same day, the Board rejected the ALJ's findings, conclusions, and recommended order; suspended Werner's license indefinitely with an opportunity to have it reinstated in five years; and assessed $16,051.51 in costs against Werner. The Board did not enter any of its own findings or conclusions. After Werner moved to vacate the Board's decision, it adopted the ALJ's findings and conclusions in their entirety but ratified its earlier sanction, which included indefinite suspension and the assessment of costs. The Board provided no explanation for its decision to impose a significantly more severe punishment.

On appeal, the Board argues that it simply decided to impose a harsher sanction. The Board correctly points out that it, not the ALJ, has the authority to issue the final order and that it may affirm, modify, or dissolve the ALJ's order. I.C. § 4–21.5–3–29(b). However, the mere fact that the Board had the authority to modify the ALJ's order does not preclude its decision from being arbitrary and capricious.

The Board goes on to argue that it "did not make additional findings because the findings of the ALJ supported the harsher sanction imposed by the Board, thus making additional findings unnecessary." Appellant's Br. p. 23. However, that is precisely the problem. The Board adopted the ALJ's findings and conclusions in their entirety and then without explanation imposed a significantly more severe sanction. Absent some explanation, the findings and conclusions adopted by the Board do not warrant the enhanced sanction.

The findings show that JM had repeated outbursts, which included acts of violence, during Werner's tenure as the administrator of Westpark. Based on Werner's handling of the situation, the ALJ and the Board concluded that she failed "to keep abreast of current professional . . . practice" as required by Indiana Code Section 25–1–9–4. The ALJ and the Board also found that given Werner's knowledge of the incidents and JM's physical and verbal aggression, her failure to ensure that Westpark's social services department set up a more effective behavior management approach was in violation of certain federal regulations and the Indiana Administrative Code. These conclusions appear to be the basis for sanctioning Werner.[2]

---

**2.** Indiana Code Section 25–1–9–4(a) provides in part:

A practitioner shall conduct the practitioner's practice in accordance with the standards established by the board regulating the profession in question and is subject to the exercise of the disciplinary sanctions

under section 9 of this chapter if, after a hearing, the board finds:

\* \* \* \* \* \*

(3) a practitioner has knowingly violated any state statute or rule, or federal statute or regulation, regulating the profession in question;

On the other hand, the ALJ and the Board found Werner's management style "did not negatively impact resident care at Westpark" and that "[d]espite the problems with JM the evidence supports the fact that overall resident care was very good under [Werner's] leadership." App. p. 46. The ALJ and the Board also emphasized the importance of looking at the overall function of a facility and the overall quality of resident care when determining the proper sanction. In that regard, the ALJ and the Board concluded, "The fact that resident care was overall very good under [Werner's] leadership as administrator of Westpark should mitigate any sanction the Board imposes upon her." *Id.* at 48.

Based on the entirety of the findings and conclusions, we cannot conclude that they speak for themselves as a basis for the Board's decision to impose a significantly more severe sanction against Werner. It is possible that Werner could have handled JM's aggressive behavior more appropriately; however, it is not clear that the manner in which she handled it warranted the sanction imposed the Board. This is especially true when considering the various sanctions available to the Board. For example, in addition to suspension and censure, the Board could have permanently revoked Werner's license, issued a letter of reprimand, placed her on a probationary status, and/or imposed a fine. *See* I.C. § 25–1–9–9.

 Although the Board has the authority to impose a significantly more severe sanction than that recommended by the ALJ, its failure to provide any explana-

tion requires us to speculate as to the basis for its decision. This renders the Board's decision arbitrary and capricious. *See Cummings,* 180 Ind.App. at 171, 387 N.E.2d at 495–96.

 Moreover, we also conclude that the Board's decision to impose a more severe sanction without explanation for its deviation from the ALJ's recommended sanction is without observance of procedure required by law. Indiana Code Section 4–21.5–3–28(g) requires the Board's final order to "identify any differences between the final order and the nonfinal order issued by the administrative law judge . . . ." The Board's order offers no explanation for the differences between its sanction and the ALJ's recommended sanction.

 The Board directs us to comments one member of the Board made during the hearing. However, comments from one member of the Board made at the oral argument are not tantamount to findings by the Board explaining the basis for imposing a more significantly more severe sanction than that recommended by the ALJ. Indiana Code Section 4–21.5–3–27(c) requires that the Board's final order include written findings of fact and conclusions of law. The findings must be based *exclusively* on evidence of the record and on matters officially noticed in that proceeding. I.C. § 4–21.5–3–27(d). A Board member's comments at an oral argument simply do not satisfy these requirements. The Board's failure to identify the difference between the final order and ALJ's

---

(4) a practitioner has continued to practice although the practitioner has become unfit to practice due to ... failure to keep abreast of current professional theory or practice ....

We note that although the Board's findings and conclusions reference this language, it

does not appear that there is a finding that Werner *knowingly* violated the regulations or that she has *become unfit to practice* due to her failure to keep abreast of current professional theory or practice.

recommended order was without observance of procedure required by law and is a basis for relief. I.C. § 4–21.5–5–14(d)(4).

Because the Board failed to explain its decision to impose a significantly more severe sanction than that recommended by the ALJ, we conclude the trial court properly granted Werner petition for judicial review. The absence of an explanation leads to speculation as to the Board's reasoning and is arbitrary and capricious. Further, by failing to provide written findings and conclusions supporting its deviation from the ALJ's recommendation, the Board acted without observance of procedure required by law.

### III. Proper Remedy

■ The Board also argues that the trial court improperly ordered it to affirm the ALJ's order recommending censure as the appropriate sanction. Indiana Code Section 4–21.5–5–15 provides:

> If the court finds that a person has been prejudiced under section 14 of this chapter, the court may set aside an agency action and:
>
> (1) remand the case to the agency for further proceedings; or
>
> (2) compel agency action that has been unreasonably delayed or unlawfully withheld.

Although the language of the statute appears to be unequivocal, a review of prior cases addressing this section leads us to conclude otherwise.

In *Indiana Alcoholic Beverage Commission v. Johnson*, 158 Ind.App. 467, 476–77, 303 N.E.2d 64, 69 (1973), we interpreted a similar prior version of this statute. We observed:

> The express intent of this part of the statute is to limit the reviewing court's authority to remand the case to the administrative agency for further proceedings after a proper determination that

the agency's decision was contrary to law. If upon remand the agency unlawfully withholds or unreasonably delays the redetermination of the case, then the trial court may compel agency action by direct order. Otherwise the reviewing court does not have power to compel agency action as part of the initial review function. It may only remand the cause for rehearing.

*Id.* at 476–77, 303 N.E.2d at 69. *Johnson* relied heavily on *Indiana Alcoholic Beverage Commission v. Lamb*, 256 Ind. 65, 70, 267 N.E.2d 161, 165 (1971), in which the Court concluded that where the record neither required the denial of the permit at issue nor justified the issuance of the permit, the trial court improperly compelled the issuance of the permit.

Based on *Johnson*, we have frequently concluded that remand is the appropriate remedy for improper administrative agency action. *See Indiana Family and Social Servs. Admin. v. Culley*, 769 N.E.2d 680, 685 (Ind.Ct.App.2002); *Indiana Alcoholic Beverage Comm'n v. Edwards*, 659 N.E.2d 631, 636 (Ind.Ct.App.1995). However, other cases have acknowledged that remand is not always appropriate. For example, we have concluded that where it would be pointless to remand, the trial court may compel agency action. *Indiana Civil Rights Comm'n v. Union Twp. Tr.*, 590 N.E.2d 1119, 1122 (Ind. Ct.App. 1 Dist. 1992), *trans. denied*, disapproved of on other grounds by *Indiana Civil Rights Comm'n v. Alder*, 714 N.E.2d 632 (Ind. 1999). In yet another case, we recognized that an agency's decision to deny an applicant's admission to an examination more than a year after he applied was unreasonably delayed and unlawfully withheld. *Real Estate Appraiser License and Certification Bd. v. Stewart*, 695 N.E.2d 962, 965 (Ind.Ct.App.1998). We concluded that the trial court did not exceed its authority

in allowing the applicant to take the exam. *Id.*

Here, because a variety of sanctions are available, the record does not clearly require the imposition of a specific sanction against Werner. *See Lamb,* 256 Ind. at 70, 267 N.E.2d at 165. Accordingly, we cannot conclude that remand would be pointless or unnecessary, or as Werner suggests, futile. The Board might very well be able to support its decision to deviate from the ALJ's recommendation and impose a significantly more severe sanction based on evidence in the record. In the alternative, after thoroughly reviewing the evidence, the Board might also decide to modify its sanction against Werner. This is a decision best left to the Board.

Further, the trial court offered no specific rationale for its finding that the Board's action was unreasonably delayed or unlawfully withheld. Although Werner filed a motion to vacate the Board's original order, there is no indication that the Board's failure to provide an appropriate explanation and adequate findings when it reconsidered its actions was done with the purpose of causing delay or withholding relief. The passage of time while the proceedings progressed is not in and of itself an unreasonable delay and does not constitute unlawfully withheld agency action.

Under these facts, the trial court improperly ordered the Board to affirm the ALJ's recommended sanction. Remand to the Board for further proceedings is the appropriate remedy.

## Conclusion

The trial court had subject matter jurisdiction over Werner's petition for judicial review. The issue of whether it had jurisdiction over the case is waived because the Board failed to raise it in a timely manner. The Board's decision to impose significantly more severe sanction without explanation is arbitrary and capricious and without observance of procedure required by law. However, under the facts of this case, the trial court should not have compelled the Board to adopt the ALJ's recommended sanctions; remand is the appropriate remedy. We affirm in part, reverse in part, and remand.

Affirmed in part, reversed in part, and remanded.

SHARPNACK, J., and RILEY, J., concur.