**INDIANA PESTICIDE REVIEW BOARD, Appellant– Respondent,**

v.

**BLACK DIAMOND PEST & TERMITE CONTROL, INC., et al., Appellees–Petitioners.**

No. 22A05–0804–CV–258.

Court of Appeals of Indiana.

April 24, 2009.

Publication Ordered June 26, 2009.

Gregory F. Zoeller, Attorney General of Indiana, Elizabeth Rogers, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

William C. Moyer, Stephen T. Naville, Lorch & Naville, LLC, Karen Yvonna Renfro, New Albany, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

The Indiana Pesticide Review Board ("the Board") appeals from the trial court's grant of the motion to correct error filed by Black Diamond Pest & Termite Control, Inc. ("Black Diamond"); Durwin Keith Duncan, Sr.; Durwin Keith Duncan, Jr.; and Brian Thomas (collectively "the

Appellees"). The Board presents the following restated issues for our review:

1. Whether the trial court erred when it reversed the Board with respect to some of the Board's findings and conclusions on judicial review.

2. Whether the trial court erred when it remanded to the Board to determine whether the penalties the Board imposed on the Appellees are appropriate.

The Appellees cross-appeal and contend that the Board's appeal with respect to Duncan, Jr. is moot.

We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

Black Diamond is an Indiana corporation located in New Albany. Duncan, Sr. and his wife are the sole shareholders of Black Diamond, and Duncan, Sr. is the president of the corporation. Duncan, Jr. is an employee of Black Diamond, and Thomas was an employee of Black Diamond at all times relevant to this appeal.

On September 21, 2005, the Office of the Indiana State Chemist ("OISC") notified Black Diamond, the Duncans, and Thomas that they had violated various pesticide laws. Because of the violations, the OISC notified the Appellees that each of their licenses[1] would be revoked and suspended indefinitely. The Appellees sought review of the OISC's decision, and, on October 23, 2006, an ALJ panel affirmed the OISC's decision. The Appellees sought review of

the ALJ panel's findings and conclusions by the Board. Following oral argument, the Board adopted the ALJ panel's findings and conclusions.

The Appellees sought judicial review of the Board's decision with the trial court.[2] On December 11, 2007, the trial court affirmed the decision of the Board. Black Diamond and the Duncans and Thomas filed motions to correct error, which the trial court granted in part and denied in part. The trial court found and concluded in relevant part as follows:[3]

26. The OISC charged Duncan, Sr. and Black Diamond for violations alleged to have occurred at the Turtle Run Winery. Duncan, Jr. was not charged. The OISC charged Duncan, Sr. and Black Diamond with a violation of I.C. [§ ] 15–3–3.6–14(2).... The OISC also charged Black Diamond and Duncan, Sr. with a violation of I.C. [§ ] 15–3–3.6–14(12) which states that a violation has occurred if a licensee "... (12) refused or neglected to comply with any limitations or restrictions on or in a duly issued license, permit, registration, or certification."

27. The OISC alleged that a violation of I.C. [§ ] 15–3–3.6–14(2) had occurred because Black Diamond or its employees had installed a CB insect sprayer closer to a wine-processing vat than what was called for in the sprayer's label. The OISC also alleged a violation of I.C. [§ ] 15–3–3.6–14(12) had occurred at the Turtle Run Winery because Black Diamond and/or its employees made pesti-

---

1. Black Diamond had its business license revoked, while the Duncans and Thomas had their applicator licenses revoked.

2. Black Diamond and the Duncans had a separate cause of action from Thomas', but the trial court consolidated the causes of action on judicial review. In addition, the Board ultimately issued two orders, one re-

voking the licenses and one denying the applications for renewal of licenses. Judicial review of both orders was consolidated as well.

3. The statutes cited in the trial court's findings and conclusions were substantively amended and recodified in 2008. *See* now Ind.Code Chs. 15–16–4 and 15–16–5.

cide applications at the Turtle Run Winery and did not have a license in 7c category.

* * *

29. In its Final Order of December 19, 2006, *the Pesticide Review Board found that Duncan, Sr. or Black Diamond had NOT committed either of the violations charged.* In its Order the Pesticide Review Board found:

7. The evidence concerning the Turtle Run Winery was not conclusive. The OISC did not convince the ALJ that Duncan, Sr. or Black Diamond failed to follow label directions regarding the use of CB flying insect spray and/or operated outside the scope of an issued certification or license.

30. *However, in its Order of May 21, 2007, the Pesticide Review Board concluded that Black Diamond and Duncan, Sr. had committed the violations and found a violation of both I.C. [§ ] 15–3–3.6–14(2) and I.C. [§ ] 15–3–3.6–14(12).* The Pesticide Review Board stated in its Order of May 21, 2007:

9. Duncan, Sr. and Black Diamond failed to follow label directions regarding the use of a CB flying insect spray at Turtle Run Winery.

10. In addition, they needed a special license to use pesticides in a place where food products were manufactured or stored (Category 7(c)) and they did not have such license.

31. No new or additional facts had been presented to the Pesticide Review Board by the OISC which would reasonably explain the conflict in these two decisions of the Pesticide Review Board. Each order was based upon the same facts and arguments presented by the OISC. The Pesticide Review Board argues that any error in reaching inconsistent determinations on the same facts and law was harmless error because of proof of other violations.

32. Duncan, Sr. and Black Diamond argue that the error, if any, was not harmless because the penalty of revocation was assessed by the Pesticide Review Board against them based upon the accumulation of all of the violations it found, some of which are erroneous.

* * *

33. I.C. [§ ]4–21.5–5–14(b) provides that a court shall grant relief to a petitioner seeking judicial review if the agency action is either arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence.

* * *

35. *Conflicting determinations made by the same fact finder based upon the same evidence and argument is arbitrary and capricious,* an abuse of discretion, and not supported by substantial evidence. . . .

* * *

36. The Pesticide Review Board's Order contained in its Order of May 21, 2007 finding violations of § 14(2) and § 14(12) by Black Diamond and Duncan, Sr. is hereby reversed and set aside.

* * *

52. Black Diamond and Duncan, Sr. were cited for a violation of § 14(2) . . . in this case. The allegation by the OISC was that Black Diamond and Duncan, Sr. failed to comply with pesticide label instructions by disposing a pesticide into sinks and public sewer drains which was inconsistent with the labeling of the pesticide. . . .

53. Duncan, Jr. was not charged with the violation in this case.

54. In 2004, the OISC received a complaint from a former Black Diamond employee who alleged pesticides were not being properly disposed of at Black Diamond. Chris Linderman, another ex-Black Diamond employee, testified that while he was employed by Black Diamond he had observed pesticides being poured into Black Diamond drains and testified that Duncan, Sr. was aware of this practice.

55. Paul Kelley ("Kelley"), an OISC investigator, traveled to the Black Diamond facility on March 8, 2004 and issued a notice of inspection to Black Diamond and informed Black Diamond that he intended to take samples from the drains as part of the investigation.

56. Kelley witnessed a Black Diamond employee with a hose in his hand and Kelley also smelled the odor of bleach. Based on his experience as a pesticide investigator, Kelley testified that bleach is suspected of breaking down some pesticides.

57. Kelley took samples from two (2) shop floor drains, the wash basin and trap underneath the wash basin, and soil samples from the drains in the shop and submitted those samples to the OISC laboratory.

58. The OISC laboratory's tests showed that the swab that Kelley took from the south drain in the shop confirmed the presence of the pesticide ingredients, Chlorpyrifos, Permethrin, and Cypermethrin. Kelley's swab from the south side wall of the wash basin confirmed Cypermethrin, and the water taken from the trap in the sink drain confirmed Deltamethrin and Cyfluthrin. The OISC laboratory confirmed the presence of Permethrin at 6.5 parts per million and Cypermethrin at 260 parts per million.

59. Cypermethrin is the active ingredient in Prevail which is known to be used by Black Diamond applicators.

60. Prevail is registered with the Environmental Protection Agency and its label contains the following directions for disposal:

**Pesticide disposal**

Pesticide wastes are toxic. Improper disposal of excess pesticide, spray mixture, or rinsate is a violation of Federal Law. If these wastes cannot be disposed of by use according to label instructions, contact your State Pesticide or Environmental Control Agency, or the Hazardous Waste Representative of the nearest EPA Regional office for guidance.

61. Black Diamond disputed that it had disposed of Prevail down its drains into sewers and presented evidence that there was a company policy which required disposal of excess pesticides pursuant to the label requirements and failure to do so could result in an employee's termination. Black Diamond further offered evidence that they had removed the floor drains so as to mitigate against any future allegations being made of a similar sort.

\* \* \*

65. The presence of Cypermethrin in the floor drains of the Black Diamond shop is evidence that Prevail had been used in the drains at Black Diamond as Cypermethrin is the active ingredient in Prevail. The OISC presented testimony that the improper disposal had occurred, Black Diamond was aware of the unlawful disposal, and laboratory results confirmed the presence of Cypermethrin in the Black Diamond drains.

\* \* \*

67. *The Pesticide Review Board's determination that Black Diamond and*

*Duncan, Sr. violated § 14(2) is supported by substantial evidence.*

\* \* \*

68.   The Pesticide Review Board determined in its Order of December 20, 2006 that revocation of the licenses of Black Diamond, Duncan, Sr. and Duncan, Jr. was appropriate because it found:

   1.   Black Diamond and Duncan, Sr. had a history with the Agency and ignored a prior order to pay a fine;

   2.   They mishandled pesticides at their place of business;

   3.   They engaged in deceptive practices with their customers;

   4.   They had been uncooperative and pugnacious; and

   5.   They had submitted evidence that was not credible.

*For these reasons the Pesticide Review Board revoked the licenses of Black Diamond, Duncan, Sr. and Duncan, Jr. This Court had determined that some, if not all, of the Pesticide Review Board's justification for a license revocation of Black Diamond, Duncan, Sr., and Duncan, Jr. is not warranted by law or facts and, as a consequence, the penalty of revocation may be excessive. For this reason, this matter is remanded to the Pesticide Review Board to determine whether or not the licenses of Black Diamond and Duncan, Sr. should be revoked or whether another lesser penalty is more appropriate under the findings and conclusions of this Court.* Duncan, Jr. was not charged with any violation in this Case.

\* \* \*

69.   In addition to the charges of a violation of I.C. [§ ]15–3–3.6–14(2) Black Diamond and Duncan, Sr. were also alleged to have violated I.C. [§ ]15–3–3.6–14(8).   These additional charges also re- lated to the purported treatments that were invoiced but not made at the Vevay and North Vernon locations.

71.   [sic] I.C. [§ ]15–3–3.6–14(8) prohibits a licensee who " . . . (8) made false or fraudulent records, invoices, or reports."

72.   Two Black Diamond invoices were admitted into evidence as exhibits. Those invoices indicate that a pesticide application had been made at the two locations and charged for by Black Diamond.   The two invoices were signed by Chris Linderman and Walter Thomas, two Black Diamond employees.

73.   At the time of hearing, Chris Linderman was a Black Diamond competitor and testified that while he was a Black Diamond employee, the practice of invoicing for a treatment that had not been made happened occasionally.   In April, 2004, Kim Smith, a former Black Diamond employee, gave the OISC a similar statement along with copies of the Black Diamond invoices.

74.   In June, 2004, the OISC took soil samples from the two locations.   The OISC laboratory test results were received by the OISC in July, 2004.   That testing found no indication of Cypermethrin in the soil at either residence . . . .

75.   *No evidence was presented before the Agency that Linderman or Thomas had created the invoicing at the direction of Duncan, Sr. or that Duncan, Sr. was even aware that these Black Diamond employees had created these invoices.*

77.   [sic] Black Diamond was unable to explain the invoicing to the OISC and it told the OISC it had no records of treatments at either of these locations.   At hearing Black Diamond offered to retreat at both of these locations.

* * *

79. The records made by Linderman and Thomas of treatment at the Vevay and North Vernon [locations] were false or fraudulent in that they purported to show a treatment at these two locations when in fact no treatment had been made by them. OISC laboratory tests confirmed that no treatment had been made.

80. Linderman and Thomas created the false or fraudulent records while they were employees of Black Diamond and within the scope and course of their employment.

81. There was no proof presented that Linderman and Thomas prepared the records at the specific directions of Duncan, Sr.

82. Indiana law is clear that the actions of employees of a corporation or entity are attributable to the corporation or entity if the actions are done within the scope and course of employment. Thus a principal is liable for any misrepresentation of his agent undertaken within the scope of the agency, whether or not the principal has knowledge of the fraud. . . .

83. Linderman and Thomas were employees and agents of Black Diamond.

84. There was no proof that Linderman and Thomas were acting at the specific direction of Duncan, Sr. or even with his specific knowledge that they were creating the false and fraudulent records. Duncan, Sr. was also an employee of Black Diamond. Black Diamond was the principal of Linderman and Thomas.

85. *The violation of the § 14(8)[sic] as found by the Agency is affirmed against Black Diamond, the business licensee, but should be reversed and set aside against Duncan, Sr.*

* * *

86. The Order of the Pesticide Review Board contained in its Order[s] of December 20, 2006 and May 21, 2007 with regards to Duncan, Sr. is hereby reversed and set aside.

87. . . . . This Court has determined that some, if not all, of the Pesticide Review Board's justification for a license revocation of Black Diamond, Duncan, Sr. and Duncan, Jr. is not warranted by law or facts and, as a consequence, the penalty of revocation may be excessive. For this reason *this matter is remanded to the Pesticide Review Board to determine whether or not the business license of Black Diamond should be revoked or whether another lesser penalty is more appropriate under the findings and conclusions of this Court.* Duncan, Jr. was not charged with any violation in this Case.

* * *

88. Duncan, Sr., Duncan, Jr. and Black Diamond were charged with violations of I.C. [§ ]15–3–3.6–14(13) and (16). 14(13) states that it is a violation for a licensee who has ". . . (13) aided or abetted a person to evade provisions of this chapter, conspired with a person to evade the provisions of this chapter, or allowed a license, permit, registration or certification to be used by another person."

89. I.C. [§ ]15–3–3.6–16(a) states:

A person who violates this chapter or impedes, hinders, or prevents the State Chemist or the State Chemist's authorized agent in performance of the State Chemist's duty commits a Class C misdemeanor.

90. In addition, Brian Thomas, a Black Diamond employee [,] was charged with a violation of § 14(6) and § 16(a). I.C. [§ ]15–3–3.6–14(6) prohibits a licensee

who "... (6) neglected or, after notice, refused to comply with this chapter, the rules adopted under this chapter, or any lawful order of the State Chemist."

91.   On September 8, 2005, Thomas met with Jay Kelley, an OISC investigator. The purpose of the meeting was for Kelley to interview Thomas with regards to his knowledge of [pesticide] applications made at Squire Boone Caverns when Thomas was employed by David Laswell.   At the time of Kelley's interview with Thomas, Thomas was a Black Diamond employee.

92.   Both Duncan, Sr. and Duncan, Jr. were present outside of Dave Laswell's business office at the time of Kelley's interview with Thomas.

93.   During the interview Thomas got up to leave after becoming uncomfortable with Kelley's questioning.   At that time, Thomas had possession of some of the OISC's investigative documents. Kelley demanded the return of those documents to him and a physical altercation between Kelley and Thomas ensued. The Corydon Police Department was called and the incident investigated.   No criminal charges were initiated against either Kelley, Thomas or the Duncans.

94.   After a "scuffle" between Kelley and Thomas, Kelley retrieved the OISC documents from Thomas and returned into Laswell's offices.   At that time, his interview with Thomas was completed. Kelley's interview with Thomas was the only purpose of Kelley's investigation on that date.

95.   After talking with Laswell awhile and putting his file back together, Kelley went back outside of Laswell's office to see if Thomas had left.   He then met Duncan, Sr. and Jr. Both Duncans gave Kelley "menacing looks," "got into his face," and threatened Kelley verbally.

However, no physical altercation between Kelley and the Duncans occurred. 96.   The ALJ and Pesticide Review Board from these facts found that:

17.   The Duncans attempted to verbally intimidate Kelley while he was pursuing an investigation and thereby hindered him from performing his duties....

18.   The Duncans employed intimidation tactics to aid Thomas, Black Diamond, and each other to evade the enforcement of the pesticide laws.

There is no proof that Kelley was in fact intimidated by the Duncans.

97.   The explanation as to why the Duncans were physically present at Dave Laswell's place of business varies by witnesses.   However, there is no record evidence that the Duncans were at Laswell's to assist Thomas in taking possession of the OISC documents and in refusing to return them on demand or in Thomas' "scuffle" with Kelley.   The OISC and the Pesticide Review Board in its Orders concluded that Thomas had impeded Kelley's investigation by taking the OISC documents which Kelley then had to retrieve by force and this constituted a violation of I.C. [§ ]15–3–3.6–16(a) and 14(6).   The OISC and Pesticide Review Board also concluded that Black Diamond, Duncan, Sr. and Duncan, Jr.   had violated   § 16(a)   and § 14(13) which require proof that they "aided and abetted Thomas" in his violation of § 14(6).

\* \* \*

98.   If an agency misconstrues the interpretation of a statute, its misinterpretation of that statute is entitled to no weight by the Court upon judicial review.   Any agency decision based upon a misconstruction of a statute is arbitrary and capricious.

99. I.C. [§ ]15–3–3.6–14 provides for the administrative action that the State Chemist may take in the event a licensee violates any of the enumerated seventeen (17) acts. I.C. [§ ]15–3–3.6–14 limits the action of the OISC and the Pesticide Review Board to administrative action and does not allow either criminal authority. In I.C. [§ ]15–3–3.6–14 the OISC may impose a civil penalty for one of its enumerated violations. A civil penalty is defined in I.C. [§ ]15–3–3.6–14.5. Or the OISC may impose an administrative penalty on a violator's license, or it may impose both. "Impeding, hindering, or preventing" a State Chemist from performing his duties is not included as one of the acts that constitute a violation of I.C. [§ ]15–3–3.6–14.

100. I.C. [§ ]15–3–3.6–16(a) criminalizes certain conduct. "A person who (1) violates this chapter or (2) impedes, hinders, or prevents the State Chemist in the performance of its duty commits a Class C misdemeanor." The use of the language "this chapter" in both § 14 and § 16(a) is ambiguous and inartfully drafted by the Indiana legislature. The use of the word "chapter" refers to all of the provisions contained in Chapter 3.6 of the pesticide use laws. To accept the OISC and Pesticide Review Board's construction would be to criminalize any conduct that arguably violated any provision of Chapter 3.6 such as the failure to submit the appropriate payment of money with an application for a license. Such an interpretation is unreasonable and neither of these statutes can be read so as to reach this conclusion.

101. *It was a misconstruction of I.C. [§ ]15–3–3.6–16(a) for the OISC and the Pesticide Review Board to "bootstrap" 16(a) into I.C. [§ ]15–3–3.6–14 with regards to the charges against Duncan, Sr., Duncan, Jr. and Black Diamond.*

102. *Further, there is no record evidence that was presented and therefore the final agency Orders of the Pesticide Review Board and the OISC contain no findings of fact as to how Duncan, Sr., Duncan, Jr., or Black Diamond "aided or abetted" Thomas in his alleged refusal to return OISC documents in the ensuing scuffle with Kelley. The Duncans' mere presence outside the scene of the confrontation is not sufficient to constitute proof of aiding and abetting. No proof was offered by the OISC other than that Duncan, Sr. and Duncan, Jr. were present at the scene outside Laswell's office and after the confrontation between Kelley and Thomas had occurred, they argued with Kelley.*

103. The purpose of Kelley's investigation on September 8, 2005 was to interview Brian Thomas. At the time Thomas left the office of Laswell, Kelley's investigation and purpose of his investigation was concluded. Therefore, at the time Kelley encountered the Duncans he was not in the performance of the State Chemist's duty.

104. When the Indiana legislature drafted § 16(a), it did so as to separate the act of "hindering" from all other violations provided in I.C. [§ ]15–3–3.6–14. Therefore, the OISC and Pesticide Review Board misapplied § 16(a) when it joined the act of hindering with other violations which are listed under § 14 and such a construction was a misinterpretation of both statutes by the OISC and the Pesticide Review Board. The Indiana legislature did not include the act of "hindering" an investigation with the list of violations for which an applicator's license may be suspended and/or revoked.

105. The OISC and Pesticide Review Board incorrectly applied an administrative remedy (revocation of a license) to

an act that is classified as exclusively a criminal offense.

106. Even if the Pesticide Review Board and the OISC were authorized to apply an administrative revocation to the act of "hindering" an OISC investigation proof of Duncan, Sr.'s presence and Duncan, Jr.'s presence outside Dave Laswell's office is not sufficient to conclude that they "aided and abetted" Thomas in any violation of § 14.

107. The OISC and Pesticide Review Board's misinterpretation and misapplication of the applicable statutes constitutes an arbitrary and capricious act and requires that the revocation ordered in the Final Agency Order of December 19, 2006 and May 21, 2007 be set aside.

Appellant's App. at 647–64 (emphases added). In sum, the trial court affirmed the Board in some respects, reversed the Board in some respects, and remanded to the Board with instructions to reconsider the revocation of the Appellees' licenses. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

█ The Administrative Orders and Procedures Act ("AOPA") applies to the review of administrative decisions. In *Equicor Development, Inc. v. Westfield–Washington Township Plan Commission,* 758 N.E.2d 34, 36–37 (Ind.2001), our Supreme Court stated the applicable standard of review as follows:

Indiana Code [S]ection 4–21.5–5–14 prescribes the scope of court review of an administrative decision. That section provides that a court may provide relief only if the agency action is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authori-

ty, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Section 4–21.5–5–14(a) further provides that "the burden of demonstrating the invalidity of the agency action is on the party . . . asserting invalidity." In reviewing an administrative decision, a court is not to try the facts de novo or substitute its own judgment for that of the agency. This statutory standard mirrors the standard long followed by this Court.

On appeal, to the extent the trial court's factual findings were based on a paper record, this Court conducts its own de novo review of the record. If the trial court holds an evidentiary hearing, this Court defers to the trial court to the extent its factual findings derive from the hearing. . . . To the extent findings turn solely on [a] paper record, review is de novo.

(Citations omitted). Here, there was an evidentiary hearing, but the trial court's findings derive from the same evidence that had been presented to the Board. Accordingly, our review is de novo.

### Issue One: Mootness Doctrine

█ Black Diamond and Duncan Jr. contend that the Board's appeal with respect to Duncan, Jr. is moot. Again, the trial court granted the Appellees' motion to correct error, which reversed the Board's revocation of Duncan, Jr.'s license and denial of Duncan, Jr.'s application for renewal of his license. Based upon that order, Duncan, Jr. applied for a license, and the OISC issued that license, which expired December 31, 2008. Duncan, Jr. then applied for a 2009 license, and the OISC granted that application. On appeal, Black Diamond and Duncan, Jr. contend that because Duncan, Jr. has a cur-

rent license, whether the Board erred when it revoked his license is moot.

But the Board contends that:

[t]he OISC granted Duncan, Jr.'s applications for renewal because it was concerned that if it denied his applications, the OISC would be subject to contempt because of the trial court's May 1, 2008, order that reversed and remanded the license revocation and the denial of the renewal application. The OISC only approved Duncan, Jr.'s renewal application because of the trial court decision reversing the Review Board. As is evident by the Review Board's appeal of the trial court's May 1, 2008, order, the OISC is still of the opinion that Duncan, Jr.'s license was properly revoked. And if the Review Board prevails in this appeal, the trial court's order setting aside the discipline of Duncan, Jr.'s license will be reversed and the discipline against Duncan, Jr. will be reinstated.

Reply Brief at 3.

■ An issue becomes moot when it is no longer live and the parties lack a legally cognizable interest in the outcome or when no effective relief can be rendered to the parties. *Ind. High Sch. Athletic Ass'n v. Durham*, 748 N.E.2d 404, 410 (Ind.Ct.App.2001). When the principal questions in issue have ceased to be matters of real controversy between the parties, the errors assigned become moot questions and the court will not retain jurisdiction to decide them. *Id.* Because the outcome of this appeal will determine whether the OISC revokes Duncan, Jr.'s 2009 license, the mootness doctrine does not apply here.

**Issue Two: Arbitrary and Capricious**

■ The Board first contends that the trial court erred when it concluded that the Board's decision with respect to some of the violations was arbitrary and capricious. A decision is arbitrary and capricious if it is made without any consideration of the facts and lacks any basis that may lead a reasonable person to make the same decision made by the administrative agency. *Ind. State Bd. of Health Facility Adm'rs v. Werner*, 841 N.E.2d 1196, 1206 (Ind.Ct.App.2006), *trans. denied.* A decision may also be arbitrary and capricious where only speculation furnishes the basis for a decision. *Id.* Simply put, an agency decision is arbitrary and capricious where there is no reasonable basis for the decision. *Id.* at 1207. We address each relevant violation in turn.

**False Records/False Reporting**

■ The Board affirmed the OISC's conclusion that Black Diamond and Duncan, Sr. violated pesticide laws when two Black Diamond employees falsified documents showing applications of pesticides in Vevay and North Vernon when no pesticide had, in fact, been applied. The trial court affirmed the Board's decision with regard to Black Diamond, but reversed the decision with regard to Duncan, Sr. The trial court found that there was no evidence that the Black Diamond employees had created the false invoices "at the direction of Duncan, Sr. or that Duncan, Sr. was even aware that these Black Diamond employees had created these invoices." Appellant's App. at 657.

But our review of the record shows that one witness testified that the company issued false invoices on "several" occasions and that Duncan, Sr. was aware of the practice. *Id.* at 80. Kimberly Smith, a former Black Diamond employee, reported to the OISC that the treatments in Vevay and North Vernon had been invoiced but no pesticides had been applied at either location. And Smith testified that Black Diamond employees made false invoices on "definitely more than ten" occasions over

the course of less than two years and that Duncan, Sr. knew about the practice. *Id.* The evidence is sufficient to support the Board's decision on this violation, and the decision is not arbitrary or capricious. We affirm the Board's revocation of Duncan, Sr.'s license as a result of the false records violations and reverse the trial court on this issue.

### Impeding an Investigation/Aiding and Abetting

■ The Board affirmed the OISC's conclusion that Black Diamond and the Duncans aided and abetted Brian Thomas, a Black Diamond employee, in impeding an OISC investigation. But the trial court found that the Board had misconstrued the relevant statutes and concluded that: 1) the Board acted arbitrarily and capriciously when it suspended Thomas' license based upon the alleged impeding of the state chemist's investigation; and 2) there was no evidence that Black Diamond or the Duncans aided and abetted Thomas in impeding the OISC's investigation. We affirm the Board on these issues.

Former Indiana Code Section 15–3–3.6–14[4] provided in relevant part:

Subject to section 14.5 of this chapter [regarding civil penalties], the state chemist under IC 4–21.5–3.6 *may warn, cite, or impose a civil penalty on a person for a violation under this chapter.* The state chemist may also deny, suspend, revoke, or modify any provision of any license, permit, or certification issued under this chapter if the state chemist finds that the applicant or the holder of a license or permit has committed any of the following acts, each of which is a violation of this chapter:

* * *

(6) Neglected or, after notice, refused to comply with this chapter, the rules

adopted under this chapter, or of any lawful order of the state chemist.

* * *

(8) Made false or fraudulent records, invoices, or reports.

* * *

(13) Aided or abetted a person to evade the provisions of this chapter, conspired with a person to evade the provisions of this chapter, or allowed a license, permit, registration, or certification to be used by another person. . . .

(Emphasis added). And former Indiana Code Section 15–3–3.6–16 provided in relevant part: "A person who violates this chapter or impedes, hinders, or prevents the state chemist or the state chemist's authorized agent in performance of the state chemist's duty commits a Class C misdemeanor."

The Board found that

17. The Duncans attempted to verbally intimidate Kelley [the state chemist] while he was pursuing an investigation and thereby hindered him from performing his duties. The fact that Kelley's interview with Thomas had concluded did not mean that his investigation was over or that he was no longer acting in his capacity as an investigator for the OISC [at the time of the altercation with the Duncans].

18. The Duncans employed intimidation tactics to aid Thomas, Black Diamond, and each other to evade the enforcement of the pesticide laws.

Appellant's App. at 679–80. And the Board concluded that Thomas, a Black Diamond employee at the time of Kelley's investigation, violated Indiana Code Sec-

---

4. Again, this statute was substantively amended and recodified in 2008.

tion 15–3–3.6–16 when he impeded an OISC agent in the performance of his duties and that Black Diamond and the Duncans violated Indiana Code Sections 15–3–3.6–14(13) when they aided and abetted Thomas in that violation. The Board recognized that Indiana Code Section 15–3–3.6–14 also authorizes the state chemist to impose a civil penalty on a person for a violation under Chapter 15–3–3.6, and that 357 Indiana Administrative Code 1–7–7(b)(3)(D) provides that the state chemist may revoke a license in lieu of or in addition to imposing a civil penalty.

But the trial court found that "[i]t was a misconstruction of I.C. [§ ]15–3–3.6–16(a) for the OISC and the Pesticide Review Board to 'bootstrap' 16(a) into I.C. [§ ]15–3–3.6–14 with regards to the charges against Duncan, Sr., Duncan, Jr. and Black Diamond." Appellant's App. at 663. In essence, the trial court found that the state chemist did not have authority to find Thomas in violation of Section 16 because it is a criminal statute. And the trial court found, therefore, that the state chemist could not find Black Diamond or the Duncans in violation of Section 14(13) based upon Thomas' alleged violation of Section 16.

This court set out the applicable standard of review in *Indiana Department of Environmental Management v. Boone County Resource Recovery Systems, Inc.,* 803 N.E.2d 267, 273 (Ind.Ct.App.2004), *trans. denied,* as follows:

> Statutory interpretation is a question of law reserved for the court and is reviewed de novo. De novo review allows us to decide an issue without affording any deference to the trial court's decision. When a statute has not previously been construed, . . . our interpretation is controlled by the express language of the statute and the rules of statutory construction. Our goal in statutory construction is to determine, give effect to, and implement the intent of the legislature. *When a statute is subject to different interpretations, the interpretation of the statute by the administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless that interpretation is inconsistent with the statute itself. When a court is faced with two reasonable interpretations of a statute, one of which is supplied by an administrative agency charged with enforcing the statute, the court should defer to the agency.* When a court determines that an administrative agency's interpretation is reasonable, it should "terminate [ ] its analysis" and not address the reasonableness of the other party's interpretation. Terminating the analysis recognizes "the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations."

(Emphasis added, citations omitted).

Here, we hold that the Board's interpretation of former Indiana Code Sections 15–3–3.6–14 and –16 is reasonable and consistent with the statutory scheme. Section 14 authorizes the state chemist to "warn, cite, or impose a civil penalty on a person for a violation *under this chapter.*" (Emphasis added). Section 16(a), also in Chapter 3.6, states: "A person who . . . impedes, hinders, or prevents the state chemist or the state chemist's authorized agent in performance of the state chemist's duty commits a Class C misdemeanor." Therefore, a person is prohibited from impeding the state chemist in the performance of his duties. While that prohibited conduct constitutes a Class C misdemeanor, a reasonable interpretation of Indiana Code Section 15–3–3.6–14 is that the state chemist has authority to impose a civil penalty for such conduct, since Sec-

tion 16 is in the same chapter as Section 14. And 357 Indiana Administrative Code 1–7–7 provides that the state chemist may revoke a license "instead of or in addition to a civil penalty." While the trial court's interpretation of the applicable statutes is not unreasonable, because we hold that the Board's interpretation is reasonable, we adopt the Board's interpretation. *See IDEM*, 803 N.E.2d at 273.[5]

▮ Further, the trial court found that the evidence did not support the Board's finding that Black Diamond and the Duncans aided and abetted Thomas in impeding the investigation because they did not arrive on the scene until after Kelley's interview with Thomas had concluded.[6] But the Board specifically addressed that point and found that Kelley's *investigation* had not concluded, but was ongoing at the time that the Duncans intervened and threatened Kelley. And there is evidence to support the Board's finding on this issue. Kelley testified that following his interview with Thomas, he reported to his superior at the OISC regarding the Thomas interview and prepared a case summary of the entire investigation. The interview with Thomas was only a "portion" of the investigation. Appellant's App. at 122. The evidence also shows that the Duncans made threatening gestures and statements to Kelley. The evidence supports the Board's conclusion that Black Diamond and the Duncans aided and abetted Thomas in impeding Kelley's investigation, and

the Board's decision is not arbitrary or capricious.

**Turtle Run Winery**

▮ Finally, while the Board concedes that it was error for the Board to partially base its denial of the Appellees' license applications on the alleged violations at Turtle Run Winery, the Board maintains that the error was harmless. We agree with the trial court that the Board erred when it cited the alleged Turtle Run Winery violations as support for the denial of license applications despite having concluded that the evidence was insufficient to support those violations in the Board's October 23, 2006, order. But we agree with the Board that the error was harmless. Because we affirm the Board's decision with respect to the false records and impeding/aiding and abetting violations, the Board had ample reason to deny the Appellees' applications in its May 21, 2007, order.

**Issue Three: Remand for Reconsideration of Penalties**

Finally, the Board contends that the trial court erred when it remanded to the Board to reconsider the revocation of the Appellees' licenses. Again, the trial court found and concluded:

The Pesticide Review Board determined in its Order of December 20, 2006[,] that revocation of the licenses of Black Dia-

---

**5.** We note that the current version of Indiana Code Section 15–3–3.6–14, now codified at Indiana Code Section 15–16–5–65, includes an express prohibition against "recklessly, knowingly, or intentionally imped[ing] or prevent[ing] the state chemist or the state chemist's agent from performing a duty of the state chemist." And the current version of Indiana Code Section 15–3–3.6–16, now codified at Indiana Code Section 15–16–5–70, still makes such conduct a Class C misdemeanor.

**6.** The trial court does not question the sufficiency of the evidence with regard to Thomas' culpability in impermissibly absconding with documents and engaging in a physical altercation in the course of his interview with Kelley. The trial court only found and concluded that the OISC did not have authority to find a violation based on that evidence under former Indiana Code Section 15–3–3.6–16.

mond, Duncan, Sr. and Duncan, Jr. was appropriate because it found:

1. Black Diamond and Duncan, Sr. had a history with the Agency and ignored a prior order to pay a fine;

2. They mishandled pesticides at their place of business;

3. They engaged in deceptive practices with their customers;

4. They had been uncooperative and pugnacious; and

5. They had submitted evidence that was not credible.

For these reasons the Pesticide Review Board revoked the licenses of Black Diamond, Duncan, Sr. and Duncan, Jr. This Court had determined that some, if not all, of the Pesticide Review Board's justification for a license revocation of Black Diamond, Duncan, Sr., and Duncan, Jr. is not warranted by law or facts and, as a consequence, the penalty of revocation may be excessive. For this reason, this matter is remanded to the Pesticide Review Board to determine whether or not the licenses of Black Diamond and Duncan, Sr. should be revoked or whether another lesser penalty is more appropriate under the findings and conclusions of this Court. Duncan, Jr. was not charged with any violation in this Case.

Appellant's App. at 656. In other words, the trial court remanded for reconsideration of the revocation of the licenses based upon its reversal of some of the Board's findings and conclusions. Because we reverse the trial court and affirm the Board on the violations challenged on appeal, we hold that there is no reason to remand to the Board for reconsideration of the revocations.

## CONCLUSION

In sum, we reverse the trial court's conclusions with respect to the following viola-

tions found by the Board: Duncan, Sr.'s involvement in making false records and aiding and abetting Thomas; Black Diamond's and Duncan, Jr.'s aiding and abetting Thomas; and Thomas' impeding the state chemist's investigation. In addition, we reverse the trial court's remand to the Board to reconsider the revocation of the Appellees' licenses. We hold that it was harmless error for the Board to rely in part on the Turtle Run allegations in denying the Appellees' applications for new licenses. And we affirm the trial court in all other respects.

Affirmed in part, reversed in part.

FRIEDLANDER, J., and VAIDIK, J., concur.

## *ORDER*

Appellant Indiana Pesticide Review board, by counsel, has filed a Motion to Publish.

Having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. Appellant's Motion to Publish is GRANTED. This Court's opinion handed down in this cause on April 24, 2009, marked Memorandum Decision, Not for Publication, is now ORDERED PUBLISHED.

NAJAM, FRIEDLANDER, VAIDIK, JJ., concur.