James R. HUNDLEY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 24A01–1010–CR–550.

Court of Appeals of Indiana.

July 14, 2011.

Patricia Caress McMath, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ryan D. Johanningsmeier, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

James R. Hundley appeals his conviction and sentence for dealing in methamphetamine, as a Class A felony, following a jury trial. Hundley presents two issues for review:

1. Whether the evidence is sufficient to support his conviction.

2. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

### FACTS AND PROCEDURAL HISTORY

On November 19, 2009, Trooper Jeremy Franklin of the Indiana State Police ("ISP") received a tip that someone was manufacturing methamphetamine on property owned by the Reverend James and Betty Hundley near Lakeview. The appellant is the Hundleys' grandson.[1]

---

1. The appellant and his grandfather share the same name. We will refer to the appellant by his last name and to the property owners, his

Trooper Franklin and ISP Trooper Pete Gates drove to the property and told the Hundleys about the tip. Hundley's grandfather stated that he had had concerns about illegal drug activity in the woods behind his house. He gave the troopers permission to search the property and directed them to a campsite in the woods where his grandson, the defendant, spent time.

The campsite was two hundred yards into the woods at the end of a trail off of the Hundleys' driveway. It was also two hundred yards from the road in front of the home, and it was not visible from either the home or the road. Troopers Franklin and Gates followed the trail to the campsite, where they found an old four-wheel ATV, a small campsite with a tent, a fire pit, and a white extended cab pickup truck. Around the burn pile they found a pop can containing a syringe and several pieces of aluminum foil. The foil pieces had burn marks and were shaped for smoking methamphetamine. Inside the tent they found lawn chairs put together to make a bed, a blanket, a table with a candle, and a belt made into a loop, which could be used to aid someone injecting drugs to find a vein. In the tent the troopers also found a blue pill crusher with red residue on it; several empty boxes of thirty-milligram pseudoephedrine pills, which are red and are used to make methamphetamine; and lithium batteries that had been cut in half.

The troopers then looked in the pickup truck, which belonged to Hundley. The truck was locked, but looking through the windows with flashlights they saw a red pitcher. After obtaining a search warrant, the troopers used a tool to unlock the truck and found a "Birch reduction meth lab." Transcript at 119. The one-gallon pitcher had been used as a reaction vessel for the methamphetamine manufacturing process. The pitcher contained pill dough, the material that remains after the active ingredient of the pseudoephedrine has been removed during the manufacturing process. Pill dough is produced during an intermediate step in the manufacturing process but contains methamphetamine. The pitcher smelled strongly of ammonia, another substance used in the manufacture of methamphetamine.

In the truck the troopers also found a coffee filter, which could have been used to strain methamphetamine from the liquid in the reaction vessel, and in the glove box were a syringe and a spoon. In addition, the troopers found cans of camp fuel, more stripped lithium batteries and empty packages of pseudoephedrine, and a black canvas bag. The bag contained a compressed gas cylinder, with the valve removed, which tested positive for anhydrous ammonia. The truck also contained another pitcher, which still contained some liquid that Trooper Franklin described as "meth oil;" a jar of the same kind of liquid; a coffee bean grinder with pseudoephedrine residue; additional coffee filters; pieces of mail addressed to Hundley, including a traffic infraction appearance form dated July 10; prescription bottles containing marijuana seeds, including a prescription bottle in Hundley's name; and several store receipts for purchases of pseudoephedrine made by Hundley's friends on November 4 through 6, 2009. Transcript at 123.

On February 5, 2010, the State charged Hundley with dealing in methamphetamine, as a Class A felony, and he was arrested on March 2, 2010. In an interrogation after the arrest, and after he had been read his *Miranda* rights, Hundley said he was a Christian. When Trooper

grandparents, as the Reverend Hundley or the Hundleys.

Franklin asked Hundley if he had asked for forgiveness for his "involvement in his meth lab[,]" Hundley hung his head and said "yes." *Id.* at 144. A trial was held on September 9, and the jury found Hundley guilty as charged. Following a hearing on September 29, the court issued a sentencing order:

> The Court finds the aggravating circumstances are as follows, to-wit: 1) the Defendant's criminal record, 2) not behaving well while on probation, and 3) [he] abused a position of trust. The Court finds the mitigating circumstances are that the Defendant has support from family; [that he] recognizes [his] problem with drug use[;] and [that the offense was] nonviolent. The Court having weighed the aggravating circumstances and mitigating circumstances now finds the aggravating circumstances outweigh the mitigating circumstances and hereby sentences the Defendant in accordance with the jury verdict as follows, to-wit: Dealing in Methamphetamine, a Class A Felony[,] to a term of Forty (40) years with the Indiana Department of Correction with Ten (10) years suspended to probation. . . .

Appellant's App. at 61. Hundley now appeals.

## DISCUSSION AND DECISION

### Issue One: Sufficiency of Evidence

When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Rhoton v. State,* 938 N.E.2d 1240, 1246 (Ind.Ct.App.2010), *trans. denied.* We look only to the probative evidence supporting the verdict and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.*

Hundley first contends that the evidence is insufficient to support his conviction because the State did not prove beyond a reasonable doubt that he was the person who manufactured methamphetamine at the campsite. He also maintains that the State did not show that the amount of methamphetamine at the campsite was greater than three grams, raising it to the level of a Class A felony. We address each contention in turn.

### Hundley as Perpetrator

■ To prove that Hundley was dealing in methamphetamine, as a Class A felony, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally manufactured or financed the manufacture of methamphetamine, pure or adulterated, and the amount of methamphetamine weighed in excess of three grams. *See* Ind.Code § 35–48–4–1.1. Hundley first contends that the State did not prove that he was the person who manufactured methamphetamine at the campsite because the State did not prove that he constructively possessed that site.

■ We have explained the proof necessary to show constructive possession as follows:

> In the absence of actual possession of drugs, our court has consistently held that constructive possession may support a conviction for a drug offense. In order to prove constructive possession, the State must show that the defendant has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband.

*Jones v. State,* 807 N.E.2d 58, 65 (Ind.Ct.App.2004) (internal quotations and citations omitted), *trans. denied.* Control in this sense concerns the defendant's rela-

tion to the place where the substance is found: whether the defendant has the power, by way of legal authority or in a practical sense, to control the place where, or the item in which, the substance is found. *Id.*

■■■ To prove the intent element of constructive possession, the State also must demonstrate a defendant's knowledge of the presence of the contraband. *See Armour v. State,* 762 N.E.2d 208, 216 (Ind.Ct.App.2002), *trans. denied.* "This knowledge may be inferred from either the exclusive dominion and control over the premise containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband." *Id.* (citations omitted). Such additional circumstances include, but are not limited to, the following: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) location of substances like drugs in settings that suggest manufacturing; (4) proximity of the contraband to the defendant; (5) location of the contraband within the defendant's plain view; and (6) the mingling of the contraband with other items owned by the defendant. *Macklin v. State,* 701 N.E.2d 1247, 1251 (Ind.Ct. App.1998). "[A] substance can be possessed jointly by the defendant and another without any showing that the defendant had actual physical control thereof." *Armour,* 762 N.E.2d at 216 (citing *Godar v. State,* 643 N.E.2d 12, 14 (Ind.Ct.App. 1994), *trans. denied* ).

Here, the evidence most favorable to the verdict shows that Hundley had the intent and the capability to maintain dominion and control over the meth lab. It was undisputed that the campsite belonged to Hundley, it was located in the woods behind Hundley's grandparents' home, and Hundley had ready access to it. Still,

Hundley argues that his friends knew of the campsite and could have accessed it at any time. Therefore, he maintains, the State did not show that the meth lab there belonged to him. We cannot agree.

The evidence required to establish control over a place is comparable to the evidence required to establish constructive possession over contraband. *Halferty v. State,* 930 N.E.2d 1149, 1152 (Ind.Ct.App. 2010), *trans. denied.* Here, the trail leading to the campsite was an offshoot of the Hundley grandparents' driveway and was not visible from the road. Hundley's grandfather testified that he allowed only Hundley, or people with Hundley, to enter the woods. Even if we assume others had access to the campsite, an assumption not supported by the actual evidence, additional circumstances support the inference that Hundley intended to maintain dominion and control over the contraband and he had actual knowledge of its presence and illegal character. In particular, the meth lab was found in Hundley's truck, which was locked, in plain view through the windows. Hundley presented no evidence that anyone besides him had keys to the truck. Indeed, even his grandfather did not have access to the truck, necessitating a warrant so that Troopers Franklin and Gates could use a tool to unlock and search the vehicle. Inside the truck were prescription bottles, at least one with his name on it, and mail addressed to Hundley. And, significantly, following his arrest, Hundley admitted his involvement with the meth lab. This evidence, taken together, supports an inference that Hundley had both the intent and the capability to maintain dominion and control over the meth lab.

Still, Hundley points to his testimony that "[s]everal of [his] acquaintances and friends had been to the campsite and so knew it was there." Appellant's Brief at 6.

He also points out that receipts found in his locked pickup truck showing purchases of pseudoephedrine belonged to some of his friends. But Hundley's arguments amount to a request that we reweigh the evidence, which we cannot do. *See Rhoton*, 938 N.E.2d at 1246. And, again, a substance can be possessed jointly by the defendant and another without any showing that the defendant had actual physical control thereof. *Armour*, 762 N.E.2d at 216 (citing *Godar v. State*, 643 N.E.2d 12, 14 (Ind.Ct.App.1994), *trans. denied* ). The evidence is sufficient to show that the meth lab belonged to Hundley.

### Amount of Methamphetamine

■ Hundley next contends that the evidence is insufficient to show that he was dealing in methamphetamine, as a Class A felony. Specifically, Hundley contends that the State did not prove that the weight of the methamphetamine found at the campsite was in excess of three grams and, therefore, the State did not prove the Class A felony. Hundley points out that his conviction was based on the weight of the pill dough sample that was tested and that the pill dough contained material in addition to methamphetamine. Hundley then argues that the court should have considered only the weight of pure methamphetamine in determining the level of his offense. We cannot agree.

■ Again, the State was required to show that Hundley knowingly or intentionally manufactured and/or financed the manufacture of more than three grams of methamphetamine, pure or adulterated. *See* Ind.Code § 35–48–4–1.1; Appellant's App. at 9. The weight element of three or more grams elevated the offense to a Class A felony. Indiana Code Section 35–48–1–18(1) defines "manufacture" to mean, in relevant part,

the production, preparation, propagation, compounding, conversion, or pro-
cessing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Section 35–48–1–18 "does not require that the process be completed or that there actually be a final product before the statute applies." *Caron v. State*, 824 N.E.2d 745, 754 n. 7 (Ind.Ct.App.2005), *trans. denied; Traylor v. State*, 817 N.E.2d 611, 619 (Ind.Ct.App.2004) (citing *Bush v. State*, 772 N.E.2d 1020, 1022 (Ind.Ct.App. 2002), *trans. denied* ), *trans. denied.*

■ The question presented in this case is whether the weight of an intermediate substance that is created in the process of manufacturing methamphetamine should be considered as a whole in determining the weight element of the offense. We hold that where, as here, the intermediate step is so near the end of the manufacturing process that the final product is present in the chemical compound, that substance qualifies as an "adulterated drug" for purposes of our manufacturing statutes.

Our conclusion is supported by our interpretation of the statutes at issue. As we have often stated:

Statutory interpretation is a question of law reserved for the court and is reviewed de novo. *Ind. Pesticide Rev. Bd. v. Black Diamond Pest & Termite Control Inc.*, 916 N.E.2d 168, 181 (Ind.Ct. App.2009) (quotation omitted), *trans. denied.* De novo review allows us to decide an issue without affording any deference to the trial court's decision. *Id.* Our goal in statutory construction is to determine, give effect to, and implement

the intent of the legislature. *Id.* When a statute has not previously been construed, our interpretation is controlled by the express language of the statute and the rules of statutory construction. *Id.* We review the statute as a whole and presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *See Curley v. Lake County Bd. of Elections & Registration,* 896 N.E.2d 24, 34 (Ind.Ct.App.2008) (quotation omitted), *trans. denied.*

*State v. Prater,* 922 N.E.2d 746, 748 (Ind. Ct.App.2010), *trans. denied.*

The term "adulterated" has been defined to mean "[t]o debase or make impure by adding a foreign or inferior substance." Black's Law Dictionary 52 (7th ed.1999). That definition, in its usual sense, implies that a substance exists in its final form before impurities are added or caused to exist.[2] But an "adulterated drug" has been defined to mean a "drug that does not have the strength, quality, or purity represented or expected." *Id.* at 513. That explanation refers to the impure condition of a substance, regardless of whether the substance was originally pure.

The legislature intended to criminalize the manufacture of pure *or adulterated* methamphetamine. *See* Ind.Code § 35–48–4–1.1. Adoption of the first definition of "adulterated" discussed above would result in an overly narrow reading of the statute, namely, that one could only manufacture an adulterated substance after he had first manufactured a pure substance. That result could not have been the intent of the

legislature. *See Prater,* 922 N.E.2d at 748. Thus, we construe "adulterated" in Section 35–48–4–1.1 to mean "impure," regardless of whether the impurities are the result of the manufacturing process or are subsequently introduced into a pure substance.

We have previously held that the additional weight of water added to pure cocaine may be considered when determining the weight of the cocaine.[3] In *Norwood v. State,* 670 N.E.2d 32, 37 (Ind.Ct.App.1996), the defendant was convicted of possession of cocaine with an intent to deliver. That offense requires possession of three or more grams of cocaine. *See* Ind.Code § 35–48–4–1. At trial, an officer testified that crack cocaine is "manufactured by mixing cocaine powder with a small quantity of water. The mixture requires from one-half hour to three hours to dry and harden." *Id.* at 37 n. 2. On appeal, the defendant argued that the trial court should have instructed the jury on the lesser included offense of possession of cocaine with intent to deliver an amount less than three grams because there was a serious evidentiary dispute about the weight element of the charged offense. In particular, he maintained that the substance had weighed more than three grams only because it contained moisture when tested and that the same sample was drier, harder, and presumably weighed less at the time of trial than at the time of analysis.

On appeal, this court observed that Section 35–48–4–1 proscribed the sale of cocaine, whether pure or adulterated, *Id.* Thus, "[t]o the extent that water contribut-

---

**2.** Certain chemical processes may result in a change in the chemical composition of a substance, as occur in the manufacture of methamphetamine. In such cases, the chemical processes brought about by the synthesis, heating, or other stimulation of materials may result in the creation of a final product mixed with by-products of that process. As de-

scribed above, the manufacture of methamphetamine produces both the controlled substance and by-products.

**3.** Before the enactment of Section 35–48–4–1.1 in 2006, methamphetamine offenses were charged under Section 35–48–4–1.

ed to the weight,[ ] it was an adulterated substance and thus properly considered in the total weight of the substance." *Id.* As a result, this court held that the "total weight of the drug, and not merely its pure content, [was] to be considered" in determining whether the weight element of offenses prosecuted under Indiana Code Section 35–48–4–1 has been met. *Id.* Thus, we held that the trial court did not err in refusing to instruct the jury on the lesser included offense.

Similarly, in *Traylor*, we held:

Sergeant Dotson testified that once the methamphetamine is finished "cooking" in the reaction vessel, the product left in the vessel is then converted into its final form: crystallized methamphetamine. Because the State showed that Traylor was producing, preparing, and processing methamphetamine, and the product in the reaction vessel weighed well over three grams, the State presented sufficient evidence that Traylor was involved in the manufacture of at least three grams of methamphetamine.

817 N.E.2d at 620.

Here, the statutory language proscribing the manufacture of methamphetamine parallels the language used in the statute proscribing the sale of cocaine. Specifically, Section 35–48–4–1.1 proscribes, in relevant part, the "manufacture" or the financing of the manufacture of "methamphetamine, pure or adulterated[,]" and that offense is a Class A felony if the "amount of the drug involved weighs three (3) grams or more[.]" The officers found a mass of pill dough in the methamphetamine lab in Hundley's locked truck. The pill dough was a mixture of methamphetamine in its final form and the by-products of manufacturing the methamphetamine. A 7.13–gram sample of that

mass tested positive for the presence of methamphetamine.[4] Construing "adulterated" in Section 35–48–4–1.1 as described above, we hold that the evidence shows that Hundley manufactured more than three grams of adulterated methamphetamine.

Still, Hundley contends that the evidence in his case is insufficient to show that the amount of methamphetamine found weighed three or more grams. In support, he relies on this court's holding in *Halferty*. There, Halferty was charged under Section 35–48–4–1.1 with dealing in methamphetamine, as a Class A felony, based on a combination of .4 gram of methamphetamine and 4.61 grams of powdered ephedrine/pseudoephedrine found at the scene. Over Halferty's objection, an officer testified that the conversion ratio between ephedrine/pseudoephedrine to methamphetamine was "*usually* around 70, 80 percent" and that one gram of ephedrine/pseudoephedrine would produce "about" .70 or .80 gram of methamphetamine. *Id.* at 1153.

Following his conviction for the Class A felony, Halferty appealed, challenging the admission of that testimony over his objection. Instead, this court considered sua sponte whether there was sufficient evidence of three grams of methamphetamine to support Halferty's conviction for Class A felony dealing in methamphetamine. The court acknowledged that "proof of three grams of methamphetamine may be shown with evidence of both finished methamphetamine and methamphetamine that is in the process of being manufactured." *Id.* at 1152. But the court also observed that the officer had testified that the conversion ratio could " 'fall below 50 percent.' " *Id.* at 1153. At a fifty-percent conversion ratio, the officer testified that

**4.** Again, the manufacturing process need not be complete before a defendant can be found to have manufactured methamphetamine.

*Caron,* 824 N.E.2d at 754 n. 7; *Traylor,* 817 N.E.2d at 619. *See also, Halferty,* 930 N.E.2d at 1154.

the powdered ephedrine/pseudoephedrine would create about 2.31 grams of methamphetamine. And at that rate, the amount of methamphetamine that could be produced from the powdered precursors found at the scene was insufficient to produce three grams or more of methamphetamine, even when added to the .40 grams of produced methamphetamine. *Id.* at 1154. As a result, this court held that the State had not proved Class A felony dealing in methamphetamine beyond a reasonable doubt. *Id.*

Hundley contends that *Halferty* holds that "there must be evidence of the weight of the methamphetamine that is in the process of being manufactured, and not just the total weight of the substance used to manufacture the methamphetamine." Appellant's Brief at 7. But *Halferty* is inapposite on these facts. Unlike in *Halferty,* no conversion from precursors was necessary here because the pill dough contained finalized methamphetamine, and any further attempts by Hundley to continue the manufacturing process would have resulted only in the extraction of methamphetamine from the adulterated drug, the pill dough. And, again, the statute prohibits the manufacture of methamphetamine, "pure *or adulterated.*" Ind. Code § 35–48–4–1.1 (emphasis added). Thus, the production of methamphetamine is prohibited, even if the methamphetamine produced is impure. The evidence is sufficient to support Hundley's conviction for the manufacture or financing the manufacture of methamphetamine, as a Class A felony.

### Issue Three: Appellate Rule 7(B)

Hundley next contends that his sentence is inappropriate in light of the nature of the offense and his character. Although a trial court may have acted within its lawful discretion in determining a sentence, Article VII, Sections 4 and 6 of the Indiana Constitution "authorize[ ] inde-pendent appellate review and revision of a sentence imposed by the trial court." *Roush v. State,* 875 N.E.2d 801, 812 (Ind. Ct.App.2007) (alteration original). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id.* Revision of a sentence under Appellate Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. *See* App. R. 7(B); *Rutherford v. State,* 866 N.E.2d 867, 873 (Ind.Ct.App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Gibson v. State,* 856 N.E.2d 142, 147 (Ind.Ct.App.2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush,* 875 N.E.2d at 812 (alteration original).

The Indiana Supreme Court recently stated that "sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind.2008). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented. *See id.* at 1224. The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224.

We first consider Hundley's argument that his sentence is not appropriate in light of the nature of the offense. In this regard, Hundley states only: "[t]here was nothing particularly egregious about this offense that makes it worse than any

other dealing methamphetamine in excess of three grams. Considering just the nature of the offense, the advisory sentence of thirty (30) years would be appropriate." Appellant's Brief at 10. Aside from being woefully briefed and unsupported by citation to any legal authority, Hundley's argument ignores the trial court's finding Hundley's criminal record, his failure to behave well while on probation, and his abuse of a position of trust with his grandparents to be aggravators. The trial court found that those aggravators warranted a sentence in excess of the advisory. Hundley's short argument to the contrary is unpersuasive.

Next we consider Hundley's argument that the sentence is inappropriate in light of his character. He concedes that "[t]here is some significance to his criminal history because he does have seven drug-related convictions and one probation violation." *Id.* Nevertheless, he points out that he has no prior felony convictions, that he has recognized that he has a drug abuse problem, and that he is a non-violent offender. He also notes that he has family support. Although that last fact does not speak directly to his character, it does weigh in his favor. Still, Hundley ignores other factors reflecting his character. Again, he has a history of seven drug offenses, he failed to behave on probation, and he abused his grandparents' trust by operating a meth lab on their property. Considering both the nature of the offense and Hundley's character, we cannot say that that the forty-year sentence, with ten years suspended to probation, is inappropriate.

Affirmed.

ROBB, C.J., and CRONE, J., concur.