v.

**STATE of Indiana, Appellee–Petitioner.**

No. 42A04–0503–JV–120.

Court of Appeals of Indiana.

Dec. 30, 2005.

Stephen P. Murphy, Jr., Murphy & Murphy, Vincennes, for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

NAJAM, Judge.

## STATEMENT OF THE CASE

T.C. appeals from his adjudication as a delinquent child for committing Receiving Stolen Property, as a Class D felony when committed by an adult. He presents the following issues for our review:

1. Whether the trial court erred when it ordered T.C. to pay restitution without inquiring into his ability to pay.

2. Whether the trial court erred when it ordered T.C. to serve one day in secured detention for each missed payment.

3. Whether the State presented sufficient evidence to support the restitution order.

4. Whether the appropriate measure of the victim's damages is the retail value of the stolen merchandise.

We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

On August 7, 2004, T.C. and his friend T.T. broke into Bicycle Outfitters, which is a store located in Vincennes. The boys stole several items, including skateboards, skateboard accessories, clothing, and cash. The State filed a petition alleging T.C.'s delinquency for committing acts that would constitute receiving stolen property and theft if committed by an adult. T.C. admitted to having committed an act that would be receiving stolen property if committed by an adult, and the trial court adjudicated T.C. a delinquent child on that basis.

Following a hearing, the trial court ordered that T.C. be placed at Gibault's School for Boys, but the court suspended that placement and ordered that T.C. serve two years of formal supervised probation. The terms of his probation included: completing forty-nine hours of commu-

nity service, continued counseling, paying restitution, and paying fees and costs. Following a restitution hearing, the trial court determined that Michael McLear, the owner of Bicycle Outfitters, sustained damages in the amount of $3120, and the court ordered T.C. to pay one-half of that amount in weekly payments of $12. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

■ An order of restitution is a matter within the trial court's discretion, and we reverse only upon a showing of abuse of that discretion. *J.P.B. v. State*, 705 N.E.2d 1075, 1077 (Ind.Ct.App.1999). An abuse of discretion occurs when the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

### Issue One: Ability to Pay

■ T.C. first contends that the trial court erred when it included restitution in the terms of his probation without first determining his ability to pay. The State

asserts that the trial court was not required to determine T.C.'s ability to pay in ordering restitution. In the alternative, the State contends that any error was harmless. We agree with T.C.

Indiana Code Section 31–37–19–5 provides that a juvenile court may order a child "to pay restitution if the victim provides reasonable evidence of the victim's loss, which the child may challenge at the dispositional hearing." Unlike Indiana Code Section 35–38–2–2.3, which governs restitution in the context of adult offenders, there is no express statutory requirement that the trial court inquire whether a juvenile offender has the ability to pay before ordering restitution. But this court has recently held that "equal protection and fundamental fairness concerns require that a juvenile court must inquire into a juvenile's ability to pay before the court can order restitution as a condition of probation." *M.L. v. State*, 838 N.E.2d 525, 527 (Ind.Ct.App., 2005).

Here, because the trial court ordered restitution as a condition of T.C.'s probation, the court was required to determine his ability to pay but did not do so.[1] This was an abuse of discretion.[2] T.C. is enti-

1. In its Order on Disposition Hearing, the trial court imposed a suspended sentence and stated in relevant part, "While on probation he shall comply with the following: ... pay restitution in an amount to be determined at a later hearing[.]" Appellant's App. at 45. Thus, the restitution is a condition of probation.

2. The State contends that any error was harmless in that the predispositional report included information regarding Mother's place of employment and T.C.'s desire to "get a paper route[.]" Appellant's App. at 42. But that information, without more, does not satisfy the requirement that the trial court determine a juvenile's ability to pay. *Compare Polen v. State*, 578 N.E.2d 755, 758 (Ind. Ct.App.1991) (holding trial court's review of presentence report, which included reference

to defendant's "substantial salary" and ability to make restitution, and evidence of her and her husband's employment histories and financial status sufficient to satisfy statutory inquiry into ability to pay). And we note that the State does not present meaningful argument to support its suggestion that T.C.'s mother is obligated under the restitution order. As such, we do not address that issue.

Further, the State contends that any error was invited in that T.C. and his mother agreed to pay restitution in an amount to be subsequently determined by the court. But in *M.L.*, we rejected a similar argument and held that "leaving the amount of restitution to the discretion of the trial court is not tantamount to waiving one's right to have the trial court inquire into his or her ability to pay." Op. at 1226.

tled to a hearing on the issue of his ability to pay and to modification of the existing restitution order if the court determines that he is financially unable to meet its terms. *See id.* Therefore, we vacate the trial court's restitution order and remand for a new restitution order contingent upon the court's inquiry into T.C.'s ability to pay.

### Issue Two: Detention

T.C. next contends that the trial court erred when it ordered that T.C. would serve one day in secured detention for any week that he fails to make a restitution payment. In particular, he maintains that the trial court cannot order that he be placed in detention without a hearing to determine whether he violated the terms of his probation. The State asserts that there is no error because the trial court's order does provide for such a hearing. We agree with the State.

■ Any change in a juvenile's disposition order, including revoking his probation, should be treated as a modification of the original order. *In the Matter of L.J.M.*, 473 N.E.2d 637, 639 (Ind.Ct.App. 1985). Indiana Code Section 31–37–22–3 provides:

> (a) If the petitioner requests an emergency change in the child's residence, the court may issue a temporary order. However, the court shall then give notice to the persons affected and shall hold a hearing on the question if requested.
> (b) If the petition requests any other modification, the court shall give notice to the persons affected and may hold a hearing on the question.

Here, the trial court's order states in relevant part:

> That further, the Court determines that [T.C.] shall serve one (1) day in secured detention at the Southwest Indiana Re-

gional Youth Village at the Court's discretion for any week that the Juvenile fails to make a restitution payment. In the event the Court imposes this penalty upon [T.C.] *following a hearing*, the parents of [T.C.] shall be financially responsible for the cost of said placement at the rate of one hundred ten dollars ($110.00) per day.

Appellant's App. at 48 (emphasis added). Because the trial court expressly provides for a hearing in the event that T.C. misses a restitution payment, there is no error.

### Issue Three: Restitution Amount

■ T.C. next contends that the trial court abused its discretion in arriving at the amount of restitution. In particular, he maintains that the evidence is insufficient to support the award of $3120. We must agree.

■ Indiana Code Section 31–37–19–5(b)(4) provides that the trial court may order a juvenile delinquent to pay restitution if the victim provides reasonable evidence of the victim's loss, which the child may challenge at the dispositional hearing. It is well settled that restitution must reflect actual loss incurred by a victim. *Smith v. State*, 471 N.E.2d 1245, 1248 (Ind. Ct.App.1984). The amount of actual loss is a factual matter which can be determined only upon presentation of evidence. *Id.*

Here, at the restitution hearing, the State submitted an itemized list of merchandise that T.C. and T.T. had stolen from Bicycle Outfitters, and the total amount of stolen cash and merchandise was $2741. Michael McLear testified in relevant part as follows:

> Q: Could you go through that list and tell us, first of all, have all these items been returned to you?

A: No, I've got ... I'd say about half to three-quarters have been returned.

\* \* \* \* \* \*

Q: Okay. Now you've listed a price number for each of these items which according to your inventory were not there after the theft, is that correct?

A: That's correct.

Q: Now is that your cost on that?

A: Oh no, that's the retail price.

\* \* \* \* \* \*

Q: Okay. Now you said *about half of these items you believe were returned to you,* is that correct?

A: *Yes.*

Q: *And are they in salable condition, the items that were returned to you?*

A: *Some are.* For instance, I received 11 of the MOB grip tape back and I have been able to sell 11 or all 11 pieces of that. The other six pieces are missing or I guess this would be one of them that I'd gotten back and I really can't sell it as an individual piece of grip tape.

Q: Okay. So when you say you've sold those, have you been able to realize your cost on those or did you have to sell it at a discount or ...

A: No, *I was able to sell them at my regular price.* They were still in good condition.

\* \* \* \* \* \*

Q: Do you think you could go through the list and by memory tell us what items have been recovered or at least your best effort at that?

A: I can make a best effort at it, yeah.

\* \* \* \* \* \*

A: ... *The Full Skull Classic [deck], I don't know if I have that one or not.*

\* \* \* \* \* \*

A: So as far as the decks go, that's what I have. *The rest of it, I'm not real familiar with what I have and what I don't.* I know I did have a trash bag full of miscellaneous items that the police recovered.

\* \* \* \* \* \*

A: I think I ... some of the boards, like those, the mini-logo decks, they look new. I haven't really examined them closely, but they look new. *I think I can sell a couple of those.*

\* \* \* \* \* \*

Q: Mr. McLear, if I understand correctly, do you have all but one of the decks back?

A: Yes.

\* \* \* \* \* \*

Q: *But you don't know exactly, you couldn't tell us line for line which items you have recovered and which ones you have not, is that correct?*

A: *That's correct.*

\* \* \* \* \* \*

Q: Now the items that are on [the list of stolen merchandise], other than going through the [skateboard] decks you've already gone through, *you don't know what items you have back and items you do not have?*

A: No, I know I have some of the items back, but I couldn't tell you .... I know I've got a few sets of wheels because they're on the actual skateboards that I recovered so I don't know exactly .... I haven't gone through and said, oh I've got spitfire wheels versus the black label wheels, no.

Q: When you got those items back, you did not check it with your inventory as you got it in?

A: No, I did not.

Q: Okay.

A: No, it's still sitting back in my office, I have not put it back out on the floor.

Q: So everything you've gotten back from the break-in is some place isolated . . .

A: Yes.

Q: . . . from what you have for sale right now?

A: That's correct.

\*   \*   \*   \*   \*   \*

A: I would estimate my cost on this list of items would be around $1,200.

\*   \*   \*   \*   \*   \*

A: *I got a pile of . . . skateboarding items that I recovered from the police sitting back in my office and I have not balanced that against my store inventory or against this list here.*

Q: *Okay. So this isn't really a true, accurate representation of what you're out, if you don't know what you're out?*

A: *No, I know what I'm out. I don't know what I'm out versus what I recovered. I mean I was out all this stuff [on the list].*

Q: Right, but a lot of it has been returned?

A: In very terrible shape, *some of it's been returned in very terrible shape.*

Q: Okay, but my question is this doesn't accurately portray what your restitution is because you have some of the items that can either be sold still as new or as even used or . . . .

A: Once restitution is full in place, I would be happy to give all this equipment that was recovered back to the people that took it so that they'd be made whole. That'd be a good way to do it because I'm really not in the used skateboard selling business. And part of the 35 percent of the costs is my time to check the items in, my time to take the orders, my long distance phone calls, that's part of the price of the $2,000 [retail] versus the $1,200 [wholesale] and it'd be nice to recover some of that. I know that that may not be . . . I mean I'm not here to be punitive to these individuals. I just want to not lose any money.

Q: You said you have all the items that were returned to you some place in your store. Wouldn't it have been possible to bring all that stuff today?

A: Yes and I invited both attorneys to come in to the store and take a look at everything.

Transcript at 14–39 (emphases added).

Our review of that testimony shows that McLear was equivocal regarding the amount of his actual loss. For instance, he could not state with certainty how many of the items included in the list had been returned to him, and while some of those items were in a salable condition, others were not. Regardless, the trial court found that McLear had sustained damages in the amount of $3120, which includes the retail value of every item included on the list. In light of the evidence, we conclude that there is an inadequate factual basis for the trial court's restitution order.[3] *See, Smith,* 471 N.E.2d at 1248; *see also, e.g., State v. Kinneman,* 155 Wash.2d 272, 119 P.3d 350, 357 (2005) (holding "[e]vidence supporting restitution is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture."). On re-

---

**3.** The State concedes that the trial court's order "does not take into account that McLear recovered many of the stolen items." Brief of Appellee at 9. But the State points out that "most" of the returned items were not in a salable condition. *Id.*

mand, the trial court shall conduct another restitution hearing to determine the amount of McLear's actual damages.

### Issue Four: Measure of Damages

■ T.C. also contends that McLear is only entitled to the wholesale value, and not the retail value, of the unsalable items. As this is a case of first impression in Indiana, we look to other jurisdictions for guidance. Both Florida and Georgia courts have held that the retail value of stolen merchandise is an appropriate measure of damages under certain circumstances. *See Garrison v. State,* 553 So.2d 1377, 1379 (Fla.Dist.Ct.App.1989); *Garrett v. State,* 175 Ga.App. 400, 333 S.E.2d 432, 435 (1985). For instance, in *Garrett,* the defendant argued that the wholesale price of goods stolen from a retail store should be used in assessing the victim's damages. But the trial court found that the retail value, "less any recovery," was appropriate where the victim testified "that she would have certain expenses attributable to borrowing money for purchase of substitute items, to having the display cases repaired, and to actually restocking the store[.]" 333 S.E.2d at 435. On appeal, the Georgia Court of Appeals agreed with the trial court, but stated that retail value is not necessarily the appropriate measure of damages in every case. *Id.*

■ Here, McLear testified that his loss exceeded the wholesale cost of the stolen merchandise in that "there's some more costs for other associated things [such as] stocking, [shipping, and] long distance calls[.]" Transcript at 42–43. Thus, the evidence supports an award in an amount more than the wholesale value of any unrecovered and/or unsalable items. Depending upon the evidence presented on remand, the trial court *may* award restitution based upon the merchandise's retail value. *See, e.g., Garrison,* 553 So.2d at 1379 (noting defendant did not present

evidence showing retail value inappropriate; holding trial court could reasonably conclude defendant "effectively stole thirteen retail sales from the victim, and that the victim was entitled to be reimbursed for those thirteen retail sales at the fair market value established by the retail price."). But we agree with the Georgia Court of Appeals that retail value is not necessarily the appropriate measure of damages in every case. *See Garrett,* 333 S.E.2d at 435.

Affirmed in part, reversed in part, and remanded with instructions.

BAILEY, J., concurs.

BAKER, J., concurs with separate opinion.

BAKER, Judge, concurring.

I concur with the result reached by the majority, but write separately with respect to the majority's conclusion regarding the appropriate measure of damages. I believe that in cases of relatively minor shoplifting, such as this one, the appropriate measure of damages should always be the retail value of the stolen items. To require a merchant to calculate wholesale, as opposed to retail, value of stolen merchandise will entail, among other things, an examination of all manner of overhead costs and lost opportunities for sale. The burden of making such calculations is onerous and, in cases involving a relatively low dollar amount of stolen items, it may be prohibitive. Thus, I believe that the better approach is to conclude that the appropriate measure of damages is always the retail value of the stolen items.