Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 24 2013, 9:12 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JANE ANN NOBLITT**
Columbus, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| E. PAUL HASTE, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 03A05-1207-CR-378 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE BARTHOLOMEW SUPERIOR COURT
The Honorable Chris D. Monroe, Judge
Cause No. 03D01-1104-FB-1929

**January 24, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Following a jury trial, E. Paul Haste ("Haste") was convicted of Class B felony dealing in methamphetamine and ordered to pay $90,000 in restitution. Haste appeals and raises two issues, which we restate as:

I. Whether the State presented sufficient evidence to support his conviction for Class B felony dealing in methamphetamine; and

II. Whether the trial court abused its discretion in ordering Haste to pay restitution in the amount of $90,000.

We affirm in part, reverse in part, and remand with instructions.

**Facts and Procedural History**

John Thomas Owens ("Mr. Owens") and Peggy Owens ("Mrs. Owens") own a two-story house with a walkout basement apartment in Columbus, Indiana. Prior to January 2011, Mr. and Mrs. Owens lived in the top two floors of the house along with Mrs. Owens's son, Andy Chappell ("Chappell"). Haste rented the basement apartment from Mr. and Mrs. Owens, and his girlfriend, Linda Kennedy ("Kennedy"), lived with him. In January 2011, Mr. and Mrs. Owens left their home for a three-month vacation in Florida. At that time, the interior door separating the basement from the rest of the house was locked. However, Mr. and Mrs. Owens usually left their front door and garage unlocked, as was customary in the area.

On March 31, 2011, while Mr. and Mrs. Owens were still on vacation, Sergeant David Steinkoenig ("Sergeant Steinkoenig") of the Bartholomew County Sheriff's Department received a tip that methamphetamine was being manufactured at the Owens's residence and that Haste was involved. He contacted Mr. Owens by telephone and asked

2

if Haste lived in the house. Mr. Owens answered affirmatively and gave Sergeant Steinkoenig permission to search the property.

Later in the day, Sergeant Steinkoenig and Detective Slate ("Detective Slate") went to the residence to speak with Haste. Near the entrance to the basement apartment, which was located in the rear of the house, Sergeant Steinkoenig found a discarded coffee filter with a fine white powder and red flakes on it. Both officers recognized the fine white powder on the coffee filter as consistent with either pseudoephedrine or methamphetamine and the red flakes as the binder on pseudoephedrine pills.

When the officers knocked on the basement door, Kennedy answered. The officers asked for Haste, who then came to the door. When the officers informed Haste that they were investigating a possible methamphetamine laboratory, Haste became visibly nervous. He started to pace around, he began sweating profusely and breathing heavily, and he would not make eye contact with the officers. When Sergeant Steinkoenig confronted Haste with the coffee filter, Haste responded that he could not see any powder because he was not wearing his glasses. The officers asked Haste if he would consent to a search of the basement apartment, but Haste refused and told the officers that they could come back later in the afternoon to perform a search. Haste then abruptly stated that he had to use the restroom and went back inside the apartment.

Approximately five minutes later, Haste reemerged from the apartment alone. Haste told the officers that he had "to take her[1] to an appointment," climbed onto a

---

[1] It was unclear from Haste's statement who he was referring to when he said "her[,]" because there was no one present on the golf cart with him.

3

nearby golf cart, and drove away. Tr. p. 422. The officers then walked back towards their vehicles, and as they did so, they passed a parked pickup truck. Sergeant Steinkoenig ran the truck's plates and discovered that it was registered to Haste. In the bed of the truck, the officers observed two plastic bottles with holes punched through their caps and a burnt residue inside the bottles. The officers recognized the bottles as hydrochloric acid generators that had been used in the production of methamphetamine.

Sergeant Steinkoenig shouted for Haste to stop. When Haste did not stop, Sergeant Steinkoenig attempted to follow the golf cart's tracks into the nearby wooded area, but he was unable to find Haste so he returned to the house. By the time Sergeant Steinkoenig returned, the golf cart was back where it had originally been parked. After other officers arrived and a perimeter was set up around the house, Detective Slate left to obtain a search warrant.

While waiting for Detective Slate to return with the search warrant, Sergeant Steinkoenig noticed that the windows on the top floor were now completely open, and he heard the sound of glass clanking and rattling. Additionally, Deputy Sheriff Jeffrey Tindell ("Deputy Tindell") could smell a chemical odor that he associated with the production of methamphetamine, and he observed a woman "hurrying around" on the ground floor of the house. Tr. pp. 297-99.

Because he believed that evidence was being destroyed, Sergeant Steinkoenig ordered Haste and Kennedy to come outside. A few moments later, Haste walked out of the basement apartment. He was sweating and appeared nervous. Because Kennedy did not come out with Haste, Sergeant Steinkoenig and another officer entered the basement

4

apartment. Sergeant Steinkoenig noticed an overwhelming chemical odor he associated with the manufacturing of methamphetamine. The officers exited the basement when they did not find Kennedy. Eventually, Kennedy exited the house through the ground floor's front door. She was sweating profusely, breathing heavily, coughing, and spitting.

When Detective Slate returned with the search warrant, the officers conducted a full search of the house. On the ground floor, which included Mr. and Mrs. Owens's bedroom, the officers did not find any evidence associated with the manufacturing of methamphetamine. When the officers moved to the top floor, however, they smelled a strong odor of solvent used in the production of methamphetamine. The odor was so overwhelming that the officers had to leave the house to retrieve protective masks.

When the officers returned to a bedroom on the second floor, Detective Slate found a large bag of rock salt, which is used to produce hydrochloric acid in the production of methamphetamine. Detective Slate also found a residue spill on the carpet, which field-tested positive for methamphetamine; a food dehydrator containing racks that held paper towels with white residue on them; and a makeup bag containing small plastic bags of white powder, which field-tested positive for methamphetamine. In the bathroom, Detective Slate found a red thermos that had a strong odor of solvent.

In another upstairs bedroom, Detective Slate found a clear plastic tub containing mason jars, a funnel, plastic pitchers, and bottles containing a white residue. He also found a bottle of Liquid Fire, which is a common ingredient used in methamphetamine production, and he found more hydrochloric acid generators like those previously observed in the bed of Haste's pickup truck. In a hallway connecting the bedroom to the

5

attic of the garage, Detective Slate found a shoebox full of ribbons from lithium batteries, which are used in the production of methamphetamine. Based on the large number of ribbons, he believed that a large batch of methamphetamine had been made. He also found an air tank with the valve modified in a manner that enabled it to hold anhydrous ammonia, which is often used in the production of methamphetamine. In a hallway closet, he found plastic tubing, a breathing mask, and a solvent commonly used in the production of methamphetamine.

In the garage, Sergeant Steinkoenig found empty packages of Sudafed and lithium batteries. He also found another air tank with a modified valve and a small propane tank. The tanks were later determined to contain anhydrous ammonia. In the basement apartment, where Haste lived, officers found numerous plastic pitchers and containers with residue and sludge, which indicated to Detective Slate that they had been used either to soak pseudoephedrine pills or as a reaction vessel.

Haste was arrested and charged in four counts: Count I, Class B felony dealing in methamphetamine; Count II, Class C felony possession of methamphetamine; Count III, Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance; and Count IV, Class D felony illegal possession of anhydrous ammonia. A three-day jury trial commenced on July 19, 2011. The jury found Haste guilty of Counts I, III, and IV, but not guilty of Count II. A sentencing hearing was held on August 17, 2011, at which the State presented evidence concerning the damage the methamphetamine manufacturing activity had caused to Mr. and Mrs. Owens's home and asked the trial court to enter a restitution order in the amount of $90,000. The trial court

sentenced Haste to a ten-year executed term on Count I, vacated the convictions on Counts III and IV due to double jeopardy concerns, and took the State's restitution request under advisement.

Haste appealed. This court dismissed his appeal *sua sponte* after concluding that the order he was appealing was not a final judgment, because the restitution issue had not been resolved when the Notice of Completion of Clerk's Record was filed on August 23, 2011. See Haste v. State, 967 N.E.2d 576 (Ind. Ct. App. 2012). On October 24, 2011, the trial court ordered Haste to pay $90,000 in restitution to Mr. and Mrs. Owens, jointly and severally, with Kennedy. Haste now appeals.

## I. Sufficiency of the Evidence

Haste first argues that the State presented insufficient evidence to support his conviction for Class B felony dealing in methamphetamine.[2] Upon a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. Chappell v. State, 966 N.E.2d 124, 129 (Ind. Ct. App. 2012) (citing McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005)), trans. denied. Rather, we consider only the probative evidence supporting the conviction and the reasonable inferences to be drawn therefrom. Id. If there is substantial evidence of probative value from which a reasonable trier of fact could have drawn the conclusion that the defendant was guilty of the crime charged beyond a reasonable doubt, then the verdict will not be disturbed.

---

[2] Haste also argues that the State presented insufficient evidence to support his convictions for Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance and Class D felony possession of anhydrous ammonia or ammonia solution. Because the trial court vacated those convictions due to double jeopardy concerns, we need not address Haste's arguments in this regard.

7

Baumgartner v. State, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). The question on appeal is whether the inferences supporting the verdict were reasonable, not whether other, "more reasonable" inferences, could have been made. Thompson v. State, 804 N.E.2d 1146, 1150 (Ind. 2004).

In order to convict Haste of Class B felony dealing in methamphetamine, the State was required to prove that Haste knowingly or intentionally manufactured methamphetamine. See Ind. Code § 35-48-4-1.1. The general assembly has defined the word "manufacture" as follows:

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Ind. Code § 35-48-1-18.

Haste specifically argues that the State did not prove that he was the person who manufactured the methamphetamine, because the majority of the contraband was found in areas of the home that Haste did not occupy. Because Haste did not have actual possession of the contraband found on the property, the State had to prove that Haste had constructive possession of the contraband. Goffinet v. State, 775 N.E.2d 1227, 1230 (Ind. Ct. App. 2002). To prove constructive possession, the State had to show that Haste had "(1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." Hundley, 951 N.E.2d 575, 579 (Ind. Ct.

8

App. 2011) (quoting Jones v. State, 807 N.E.2d 58, 65 (Ind. Ct. App. 2004)) (internal quotation marks omitted), trans. denied.

To prove the intent element, the State had to "demonstrate [Haste's] knowledge of the presence of the contraband[,]" which can be inferred from either exclusive control of the premises or from "evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband." Id. (quoting Armour v. State, 762 N.E.2d 208, 216 (Ind. Ct. App. 2002)) (internal quotation marks omitted). Because Haste shared the basement apartment with Kennedy and Chappell lived upstairs, the State was required to present evidence of additional circumstances. Additional circumstances that can point to defendant's knowledge include, in part, the following:

(1) incriminating statements by the defendant;
(2) attempted flight or furtive gestures;
(3) location of substances like drugs in settings that suggest manufacturing;
(4) proximity of the contraband to the defendant;
(5) location of the contraband within the defendant's plain view; and
(6) the mingling of the contraband with other items owned by the defendant.

Id. at 580 (citing Macklin v. State, 701 N.E.2d 1247, 1251 (Ind. Ct. App. 1998)).

Here, Haste acted furtively. When the officers originally informed Haste they were investigating a possible methamphetamine laboratory and showed him the coffee filter found outside his apartment, Haste appeared visibly nervous, paced around, was sweating and breathing heavily, and avoided eye contact with the officers. Haste told officers he had to go the restroom but came back out about five minutes later and told officers he had "to take her to an appointment[.]" Tr. p. 422. He then left alone on a golf cart but circled, almost immediately, back around to his basement apartment. When the

9

officers later ordered Haste to exit the house after they heard sounds indicating evidence may be being destroyed, Haste again appeared nervous and was sweating.

Moreover, the officers found contraband in close proximity to Haste and mingled with other items owned by defendant. When the officers first approached the basement apartment they found a discarded coffee filter outside the basement apartment with what they recognized was either pseudoephedrine or methamphetamine. The officers also found hydrochloric acid generators, which are used in the production of methamphetamine, in the bed of Haste's truck. When the officers entered the basement apartment, from which Haste had just exited, they noticed an overwhelming chemical odor associated with manufacturing methamphetamine, and they later found numerous plastic pitchers and containers with residue and sludge, which indicated to Detective Slate that they had been used either to soak pseudoephedrine pills or as a reaction vessel.

In the main house and garage, both of which Haste could access through unlocked doors, additional evidence of methamphetamine production was found, including: containers, ribbons from lithium batteries, tanks modified to hold anhydrous ammonia, hydrochloric acid generators, and a food dehydrator containing paper towels with white residue. As the officers testified at trial, these items are all used in the production of methamphetamine. For these reasons, we conclude the additional circumstances indicate that Haste had the intent to maintain dominion and control over the contraband.

To prove the capability to maintain dominion and control, the State had to show that Haste had "the power, by way of legal authority, or in a practical sense, to control the place where, or the item in which, the substance is found." Hundley, 951 N.E.2d at 579

(citing Jones v. State, 807 N.E.2d 58, 65 (Ind. Ct. App. 2004)). Here, Haste had dominion and control over the basement apartment, because he rented the apartment and had clear legal authority over his space. In addition, he owned the truck in which the hydrochloric acid generators were found. Haste also had access to the main house by the front door that was routinely unlocked, he had access and permission to enter the garage, and he knew the owners of the home were in Florida. Therefore, in a practical sense he had the capability to control these places as well.

The record reflects that Haste acted furtively and that the precursors and contraband were found in close proximity to Haste and were mingled with other items he owned. Moreover, Haste had the capability to maintain dominion and control over the premises. For all these reasons, we find there was sufficient evidence to support the jury's conviction of Class B felony dealing in methamphetamine.

## II. Restitution

The trial court has discretion in ordering restitution, and we reverse only for an abuse of discretion. Lang v. State, 911 N.E.2d 131, 135 (Ind. Ct. App. 2009). A trial court abuses its discretion "if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or if the trial court misinterprets or misapplies the law." Iltzsch v. State, 972 N.E.2d 409, 412 (Ind. Ct. App. 2012).

Indiana Code section 35-50-5-3(a) provides that a court can impose restitution to the victim of the crime in addition to any sentence imposed for a felony or misdemeanor. "The court shall base its restitution order upon a consideration of: (1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or

11

replacement if repair is inappropriate) . . . ." Id. The "trial court's restitution order must be supported by sufficient evidence of actual loss sustained by the victim of a crime." Iltzsch, 972 N.E.2d at 412 (citing Rich v. State, 890 N.E.2d 44, 48 (Ind. Ct. App. 2008)). "The amount of actual loss is a factual matter that can be determined only upon the presentation of evidence." Rich, 890 N.E.2d at 48 (quoting Bennett v. State, 862 N.E.2d 1281, 1286 (Ind. Ct. App. 2007)) (internal quotation marks omitted). "Evidence supporting a restitution order is sufficient 'if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture.'" J.H. v. State, 950 N.E.2d 731, 734 (Ind. Ct. App. 2011) (quoting T.C. v. State, 839 N.E.2d 1222, 1227 (Ind. Ct. App. 2005)).

Haste argues that the State's evidence regarding the amount of property damage was speculative and that the restitution order should be reduced to the $1,725.00 that Mr. Owens paid to Crisis Cleaning. Mr. Owens's testimony regarding his property damage fell into two categories—the cleaning costs and the costs of the items that will have to be removed from the home due to contamination.

With regard to the cleaning costs, Mr. Owens testified and provided a bid from Crisis Cleaning. This bid itemized the different aspects of clean up that would have to be completed. The bid totaled the cost of cleaning to be $28,997.00 in addition to the $1,725 Mr. Owens had already paid to Crisis Cleaning. While Haste argues that the clean up estimation is speculative since Mr. Owens has not yet paid for the service, we disagree. See Iltzsch, 972 N.E.2d at 414 (noting that the validity of claimed restitution amounts can be based on appraisals or estimates). Here, we defer to the trial court's

12

discretion and find that there was sufficient evidence from to support restitution for cleaning costs in the amount of $30,722.

In addition to cleaning costs, Mr. Owens testified that it would cost another $60,000 to $70,000 to restore the home to its previous condition, because of the items that would have to be removed from the home and replaced due to contamination. A victim's sworn testimony may, at times, provide adequate evidence to support a restitution order. See Blixt v. State, 872 N.E.2d 149, 154 (Ind. Ct. App. 2007) (holding that victim's mother's testimony regarding the precise amount of out-of-pocket medical expenses was sufficient evidence to establish the amount of the victim's loss). However, if the sworn testimony is based on speculation, it is not sufficient evidence, by itself, to support a restitution order. Cf. Iltzsch, 972 N.E.2d at 412 (noting that the amount of damages cannot be based on speculation but rather must be actual losses suffered).

Here, the State presented sworn testimony by Mr. Owens regarding the amount of his damages; however, Mr. Owens's testimony was speculative regarding the cost to replace the items in the home, because he did not itemize the specific property damaged[3]

---

[3] In Iltzsch, we noted that there was not "an itemized statement of how many records there were and their age or type[.]" 972 N.E.2d at 414. Here, the State did not have Mr. Owens itemize the property damaged. Mr. Owens only testified that the upholstered furniture in four bedrooms, a television room, a breakfast room, a formal dining room, and a living room would have to be replaced along with "most" appliances in two kitchens and "most" of the wood paneling in the home, but he did not list the specific items damaged within the rooms. He also testified that the HVAC system had to be replaced and some walls had to be torn out, but he again did not provide any specific details regarding these items.

or provide the basis for his valuation of the property.[4] Moreover, our review of Mr. Owens's testimony shows that he was equivocal regarding the amount of the actual loss in that he provided a "low-end estimate" and did not give a definitive amount of the losses he suffered but rather provided a range of $60,000 to $70,000. Tr. p. 693.

Thus, "[w]e can come to no other conclusion than that the 'estimates' were mere speculation or conjecture[.]" J.H., 950 N.E.2d at 734. In contrast, the trial court could appropriately conclude, without speculating, that Mr. Owens had $30,277 of cleaning costs because of the detailed evidence the State provided in this regard.

In addition, we note that the State had a "full and fair opportunity to obtain and present evidence" but failed to do so; therefore, we reverse and do not permit the state to conduct a new restitution hearing. Iltzsch, 972 N.E.2d at 415 (holding that where the where the State had a "full and fair opportunity to obtain and present evidence" concerning the victim's actual loss but failed to do so, allowing the state to conduct a new restitution hearing would permit "an inappropriate second bite at the apple"). Thus, we remand with instructions for the trial court to reduce the restitution order to $30,722.

**Conclusion**

We hold that there was sufficient evidence to support Haste's conviction for Class B felony dealing in methamphetamine, but that the trial court abused its discretion in

---

[4] In Iltzsch, we noted that the State erred when it failed to "explain the basis for [the victim's] valuation." 972 N.E.2d at 414; see also T.C., 839 N.E.2d at 1228 (holding that retail value is not necessarily the appropriate measure of damages in every case). And here, it is unclear whether Mr. Owens's valuation was based on the amount paid for the property originally, the depreciated value of the property, or the replacement cost of the property. Id.; see also S.G. v. State, 956 N.E.2d 668, 683 (Ind. Ct. App. 2011) ("Restitution is not a means by which a victim may obtain better or more state of the art equipment.")).

14

entering a restitution order of $90,000. We remand for the trial court to reduce the restitution order to $30,722.

Affirmed in part, reversed in part, and remanded with instructions.

KIRSCH, J., concurs.

CRONE, J., concurs in part and dissents in part with separate opinion.

E. PAUL HASTE,                           )

                                      )

     Appellant-Defendant,         )

                                        )

        vs.                         )     No. 03A05-1207-CR-278

                                        )

STATE OF INDIANA,            )

                                        )

     Appellee-Plaintiff.           )

**CRONE, Judge, concurring in part and dissenting in part**

I concur as to the sufficiency issue. As to the restitution issue, I respectfully dissent. Indiana Code Section 35-50-5-3(a) provides that a court "shall base its restitution order upon a consideration of … property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate)." At the sentencing hearing, Mr. Owens testified under oath in pertinent part as follows:

> All furniture has to be destroyed and hauled to the landfill. Appliances. A few possessions that can be washed, like bed linens and stuff can be …, *but basically the house has to be gutted, as far as possessions.* And then the estimate for the clean-up bill right now is right at thirty thousand dollars and that includes, both furnaces have to be removed and HVAC systems have to be removed and replaced.[5] And that's just the start.… It's a fairly large house. We're looking at two kitchens to replace appliances. We're looking at four bedrooms worth of furniture, a TV room, a breakfast room,

---

[5] Crisis Cleaning's bid for decontaminating the Owenses' residence does not include the cost of replacing the furnaces and HVAC systems.

formal dining room, living room.  All that furniture has, either has been or is going to be hauled to the, to the landfill.  You know, it's, it's, *a low-end estimate* will be sixty to, not counting the cleaning, plus another sixty to seventy thousand dollars to put the home back and, *and fully indemnify us to where we were when we started.*

Tr. at 692-93 (emphases added).

The majority concludes that "Mr. Owens's testimony was speculative regarding the cost to replace the items in the home, because he did not itemize the specific property damaged or provide the basis for his valuation of the property."  Slip op. at 13 (footnotes omitted).  In the civil context, we have said that "the owner of personal property is competent to testify as to its value."  *Coyle Chevrolet Co. v. Carrier*, 397 N.E.2d 1283, 1287 (Ind. Ct. App. 1979), *trans. denied*.  Although it is true that Mr. Owens did not itemize every piece of property that was damaged, I think it is fair to say that he knew how much property he had and was competent to testify about how much it would actually cost to replace it, that is, to "indemnify [them] to where [they] were when [they] started."  Of course, Mr. Owens's testimony was subject to the crucible of cross-examination as to values, yet there was none.  The State need not prove the amount of restitution beyond a reasonable doubt, and we need not demand scientific precision here.  At the very least, Mr. Owens's sworn testimony supports a value of well over $30,722 (the quoted price for merely decontaminating the Owenses' residence plus their current out-of-pocket expenses), and the trial court was well within its discretion to fix the value at $90,000.  I would affirm in all respects.

17